OXFORD PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63464. Filed February 24, 1960.

*Thomas N. Tarleau, Esq., Robert B. Hodes, Esq.,* and *Nicholas J. Sheppard, Esq.,* for the petitioner.

*Emil Sebetic, Esq.,* for the respondent.

TRAIN, *Judge:* The respondent determined deficiencies in petitioner's income and excess profits taxes for 1950 and 1951 in the respective amounts of $153,959.75 and $402,847.03.

The issue for decision is whether respondent erred in disallowing the claim for excess profits tax relief asserted by petitioner under section 442 of the Internal Revenue Code of 1939,[1] relating to abnormalities during the base period.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioner, Oxford Paper Company, hereinafter referred to as Oxford, is a corporation organized and existing under the laws of the State of Maine, with its principal offices at 230 Park Avenue, New York, New York. Its returns for the taxable years 1950 and 1951 were filed with the director of internal revenue, Upper Manhattan District of New York. Oxford keeps its books and files its returns on the calendar year accrual basis of accounting.

Oxford owned and operated, at all times material herein, a fully integrated mill on the Androscoggin River at Rumford, Maine, the principal products of which are paper and woodpulp. The mill and the equipment contained therein were operated primarily by electric power, although some hydromechanical power was utilized.

Oxford's mill operation is complete from wood to finished paper and includes the production of pulps and chemicals required in its papermaking processes. Although principally devoted to the production of book and printing papers, the mill's normal operations at all times material herein included the production of its requirements of groundwood, sulphite and soda pulps. Pulp was also produced for sale to customers. In addition, the mill includes one of the largest electrochemical plants in the industry for the production of substantially all of the mill's requirements of caustic soda and chlorine.

During 1947 and 1948, the mill's papermaking operations were based upon three pulp making processes: (a) The semi-Kraft pulp process which replaced the soda pulp process on November 1, 1948, (b) the sulphite pulp process and (c) the groundwood pulp process. The basic difference between these was the method of breaking down the wood fibers into pulp. In the semi-Kraft, soda pulp and sulphite processes, logs are placed in drum barkers, where the bark is worked

---

[1] All statutory references contained herein are to the Internal Revenue Code of 1939.

off the logs, then conveyed to chippers to be cut into approximately 1-inch pieces and from there to digesters where the chips are cooked with chemicals to separate the cellulose fibers from the lignin binder. In the semi-Kraft process sulphur is an ingredient in the cooking liquor. This permits a greater yield of pulp per pound and a stronger fiber than any of the other processes and permits the recovery of a substantial part of the chemicals. The sulphite process is an acid process in which there is no recovery of the chemicals. After the cooking has broken down the fibers into a pulp, the separate pulps are carried through washers, rifflers, screens, and deckers before being bleached. After bleaching, the pulps are separately stored.

In the groundwood pulp process logs are forced against grinders, operated primarily by hydromechanical power from water wheels, which grind the logs into fibers, thus avoiding cooking. The fibers are then screened and mixed with a thickener before being stored as pulp.

After storage the pulps are blended according to formulae determined by the type and grade of paper ordered and put through beaters and jordans where they are refined by mechanical disintegration of the fibers for the paper machines.

As the pulp is carried onto the paper machine, the water is drained off and the fibers adhere to one another, becoming paper as it is dried and pressed. As the paper comes off the dry end of the paper machine, it is rolled on to bars and sometimes conveyed to supercalenders where it is pressed at high speeds to give the paper added finish. The paper is either rewound to be shipped in rolls or cut for shipment in flat packages.

During 1947 and 1948 the mill relied chiefly upon the following major pieces of equipment which were operated primarily by hydroelectric power for the production of paper, pulp, and chemicals:

(a) An electrochemical plant consisting of 288 electrolytic cells which required 1,900 kilowatts of electric power for normal operations.

(b) Two drum barkers, each requiring about 190 kilowatts of electricity.

(c) Sixty-eight pulp beaters, each requiring approximately 50 kilowatts of electricity.

(d) Thirteen jordans, each requiring about 75 kilowatts.

(e) Twelve paper machines until April 18, 1948, when the 13th, a new paper machine (No. 12), started up, varying in size and power requirements from 120 kilowatts on the smallest machine to 2,990 kilowatts on the larger machines.

(f) Eighteen supercalenders each requiring up to 375 kilowatts of electric power for their operation.

In addition, the mill contained a complete groundwood pulpmill, a bleaching plant, a chemical recovery system, and many other pieces of machinery and equipment necessary for the production of pulps and finished paper, all of which were operated primarily by electric power.

From 1941 to 1945, Oxford operated under War Production Board restrictions. During the post-World War II period following 1945, the demand for its products, particularly the demand for book and printing paper, exceeded the capacity of Oxford. Upon the lifting of World War II controls, Oxford began capital improvements to meet the increased demand for paper. This program, to the extent completed by the end of 1948, consisted primarily of the following major improvements:

(a) No. 11 paper machine, originally built in 1921, was rebuilt over the period 1945–1948, inclusive, to produce "on-the-machine" coating and to increase its speed and its capacity from 450 feet per minute to 900 feet per minute. During 1945 and 1946, the machine had produced 10,681 and 12,709 tons of paper, respectively. The "start-up" date of the rebuilt machine was February 1, 1947. In 1947, it produced 25,471 tons and in 1948, it produced 34,149 tons. The capital expenditure for No. 11 paper machine from 1945 through 1948 was $2,361,865.

(b) No. 12 paper machine was purchased and installed during the years 1946, 1947, and 1948. Its "start-up" date was April 18, 1948. This new machine, designed for 1,200 feet per minute operating speed, produced 21,853 tons of paper in 1948 and 37,998 tons in 1949, its first complete year of operation. The capital expenditure for No. 12 paper machine from 1945 through 1948, inclusive, was $4,137,653.

(c) A new boiler (No. 3) was installed during 1947 and 1948 to provide additional steam for use in the mill. Its "start-up" date was April 4, 1948. The capital expenditure for this equipment was $1,159,116 and it provided additional steam of 1,021 million pounds per year in 1948 and 1,242 million pounds in 1949.

(d) A new 8,000-kilowatt back-pressure turbine was installed and started up on June 1, 1948, at a cost from 1946 through 1948 of $592,076 and produced, during 1948, 22.3 million kilowatt-hours of electricity.

(e) The hardwood Kraft mill, which began full operations in November 1948, was installed at a total cost of $2,514,855, over the period 1947–1949, inclusive, to provide for the conversion from the soda pulp process to the Kraft pulping process.

(f) A chemical recovery unit, installed as a major component of the Kraft operations at a cost of $1,064,536, started up on April 1, 1948.

(g) Three forced circulation sulphite digesters were added during July, August, and September of 1947 at a total expenditure of $141,088.

In addition, other capital expenditures were made throughout the period 1945 to 1951 for the purpose of increasing the efficiency and capacity of the mill.

During the years 1942 through 1951 Oxford produced in tons, finished paper, soda pulp, groundwood pulp, Oxford sulphite, Island sulphite, chlorine, and caustic, all as follows:

| Year | Finished paper | Soda pulp | Ground-wood pulp | Oxford sulphite | Island sulphite | Chlorine | Caustic |
|------|------|------|------|------|------|------|------|
| 1942 | 105,046 | 45,191 | ---------- | 43,476 | ---------- | 4,690 | 5,258 |
| 1943 | 107,746 | 41,167 | 2,216 | 41,293 | 32,750 | 4,507 | 5,059 |
| 1944 | 108,710 | 32,881 | 13,390 | 33,060 | 26,754 | 3,959 | 4,459 |
| 1945 | 111,425 | 39,591 | 10,596 | 35,884 | 30,607 | 4,087 | 4,617 |
| 1946 | 131,494 | 48,480 | 7,822 | 40,095 | 34,810 | 4,387 | 4,943 |
| 1947 | 138,768 | 48,599 | 7,992 | 41,523 | 40,000 | 4,571 | 5,151 |
| 1948 | 157,993 | 48,298 | 11,299 | 40,797 | 39,000 | 4,229 | 4,764 |
| 1949 | 160,645 | 43,664 | 12,560 | 42.087 | 39,423 | 4,613 | 5,198 |
| 1950 | 180,210 | 64,001 | 15,300 | 40,971 | 40,032 | 4,807 | 5,419 |
| 1951 | 186,357 | 81,438 | 16,520 | 40,688 | 38,985 | 4,568 | 5,147 |

During the years 1942 through 1951 Oxford's sales of paper and pulp were as follows:

| Year | Tons | | | Dollars | | |
|------|------|------|------|------|------|------|
| | Paper | Pulp | Total | Paper | Pulp | Total |
| 1942 | 108,885 | 27,918 | 136,803 | $13,071,375.99 | $1,823,840.28 | $14,895,216.27 |
| 1943 | 111,248 | 18,515 | 129,763 | 15,236,826.95 | 1,258,094.78 | 16,494,921.73 |
| 1944 | 112,679 | 17,888 | 130,567 | 17,618,237.79 | 1,513,549.66 | 19,131,787.45 |
| 1945 | 115,273 | 20,142 | 135,415 | 17,889,468.89 | 1,819,492.10 | 19,708,960.99 |
| 1946 | 136,828 | 16,945 | 153,773 | 21,682,730.40 | 1,587,657.68 | 23,270,388.08 |
| 1947 | 144,144 | 20,173 | 164,317 | 27,027,889.96 | 2,233,166.64 | 29,261,056.60 |
| 1948 | 161,380 | 14,437 | 175,817 | 30,770,551.20 | 1,708,120.22 | 32,478,671.42 |
| 1949 | 162,870 | 11,358 | 174,228 | 29,736,138.00 | 1,146,850.00 | 30,882,988.00 |
| 1950 | 185,077 | 25,774 | 210,851 | 34,223,372.00 | 2,747,726.00 | 36,971,098.00 |
| 1951 | 188,904 | 31,278 | 220,182 | 39,970,440.00 | 4,098,685.00 | 44,069,125.00 |

During the years 1946 through 1949 Oxford's monthly finished paper production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|------|------|------|------|------|
| January | 10,792 | 10,655 | 13,202 | 13,546 |
| February | 10,176 | 11,021 | [2] 11,680 | 11,421 |
| March | 11,555 | 11,655 | [2] 10,755 | 13,304 |
| April | 11,323 | 11,925 | 12,770 | 12,887 |
| May | 11,321 | 12,574 | 14,295 | 13,421 |
| June | 10,107 | 11,580 | 13,669 | 13,180 |
| July | 10,323 | 10,205 | 12,187 | 11,987 |
| August | 10,679 | 10,779 | 12,995 | 13,863 |
| September | 10,786 | 11,710 | 13,303 | 12,974 |
| October | 11,988 | 12,847 | 14,622 | 15,313 |
| November | 11,594 | 12,467 | 14,593 | 15,110 |
| December | 10,850 | [2] 11,330 | 13,922 | 13,639 |
| Total | 131,494 | 138,768 | 157,993 | 160,645 |

[2] Only months in which petitioner alleges specific production of paper losses due to power shortages

During the years 1946 through 1949 Oxford's average daily finished paper production in tons, for each month, was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 385.4 | 355.2 | 440.1 | 483.8 |
| February | 376.9 | 408.2 | 432.6 | 456.8 |
| March | 398.4 | 388.5 | 370.9 | 492.7 |
| April | 404.4 | 411.2 | 440.3 | 444.4 |
| May | 404.3 | 419.1 | 476.5 | 432.9 |
| June | 388.7 | 413.57 | 471.3 | 439.3 |
| July | 382.3 | 392.5 | 468.7 | 413.3 |
| August | 395.5 | 415.3 | 499.8 | 447.2 |
| September | 399.5 | 418.2 | 475.1 | 463.4 |
| October | 399.6 | 428.2 | 471.7 | 494.0 |
| November | 399.8 | 429.9 | 503.2 | 503.7 |
| December | 374.1 | 390.7 | 480.1 | 470.3 |

Petitioner's daily paper production in tons during the months of February, March, and December in the years 1946 through 1949 was as follows:

| February | 1946 | 1947 | 1948 | 1949 | February | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 414 | 381 | S434 | 446 | 17 | S398 | 445 | 444 | 500 |
| 2 | 388 | S___ | 131 | 467 | 18 | 405 | 437 | 397 | 496 |
| 3 | S384 | 365 | 335 | 450 | 19 | 411 | 379 | 416 | 451 |
| 4 | 396 | 388 | 334 | 469 | 20 | 397 | 434 | 430 | S___ |
| 5 | 391 | 397 | 438 | 460 | 21 | 374 | 391 | 428 | 460 |
| 6 | 389 | 412 | 464 | S___ | 22 | 366 | 406 | S437 | 482 |
| 7 | 392 | 404 | 454 | 391 | 23 | 388 | S407 | 423 | 456 |
| 8 | 379 | 397 | S___ | 503 | 24 | S 42 | 428 | 444 | 458 |
| 9 | 384 | S410 | 395 | 497 | 25 | 353 | 416 | 458 | 467 |
| 10 | S___ | 423 | 443 | 481 | 26 | 397 | 457 | 472 | 478 |
| 11 | 380 | 402 | 459 | 489 | 27 | 374 | 429 | 454 | S___ |
| 12 | 401 | 406 | 465 | 359 | 28 | 404 | 410 | 449 | 460 |
| 13 | 395 | 416 | 430 | S151 | 29 | --- | --- | S433 | --- |
| 14 | 415 | 420 | 337 | 501 | | | | | |
| 15 | 374 | 371 | S430 | 524 | Total | 10,176 | 11,021 | 11,680 | 11,421 |
| 16 | 385 | S390 | 446 | 525 | | | | | |

Note: S—Sunday.

| March | 1946 | 1947 | 1948 | 1949 | March | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 405 | 420 | 457 | 486 | 18 | 405 | 404 | 456 | 437 |
| 2 | 382 | S___ | 423 | 483 | 19 | 407 | 390 | 449 | 507 |
| 3 | S383 | 239 | 458 | 492 | 20 | 419 | 417 | 446 | S___ |
| 4 | 404 | 440 | 415 | 486 | 21 | 406 | 417 | S456 | 453 |
| 5 | 405 | 415 | 348 | 519 | 22 | 399 | 398 | 455 | 448 |
| 6 | 398 | 403 | 144 | S___ | 23 | 408 | S407 | 446 | 453 |
| 7 | 397 | 423 | S___ | 439 | 24 | S___ | 421 | 457 | 511 |
| 8 | 372 | 411 | 264 | 568 | 25 | 364 | 415 | 391 | 457 |
| 9 | 389 | S421 | 247 | 522 | 26 | 417 | 393 | 407 | 507 |
| 10 | S___ | 425 | 220 | 546 | 27 | 406 | 435 | 415 | S___ |
| 11 | 376 | 399 | 352 | 531 | 28 | 406 | 436 | S___ | 475 |
| 12 | 431 | 383 | 343 | 505 | 29 | 393 | 382 | 219 | 484 |
| 13 | 412 | 371 | 322 | S___ | 30 | 388 | S 58 | 419 | 477 |
| 14 | 417 | 437 | S338 | 457 | 31 | S409 | 317 | 418 | 505 |
| 15 | 387 | 385 | 263 | 526 | | | | | |
| 16 | 391 | S397 | 304 | 549 | Total | 11,555 | 11,655 | 10,755 | 13,304 |
| 17 | S379 | S396 | 423 | 481 | | | | | |

Note: S—Sunday.

| December | 1946 | 1947 | 1948 | 1949 | December | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | S383 | 436 | 554 | 539 | 18 | 411 | 449 | 522 | S208 |
| 2 | 386 | 420 | 565 | 509 | 19 | 387 | 400 | S193 | 491 |
| 3 | 398 | 412 | 563 | 523 | 20 | 397 | 423 | 449 | 522 |
| 4 | 409 | 415 | 574 | S221 | 21 | 399 | 446 | 536 | 512 |
| 5 | 410 | 419 | S216 | 519 | 22 | S433 | S412 | 565 | 492 |
| 6 | 412 | 401 | 516 | 573 | 23 | 407 | 419 | 468 | 485 |
| 7 | 412 | S424 | 535 | 559 | 24 | 116 | 136 | 150 | 138 |
| 8 | S___ | 407 | 541 | 540 | 25 | ----- | ----- | ----- | S___ |
| 9 | 363 | 386 | 511 | 506 | 26 | 238 | 230 | S___ | 392 |
| 10 | 393 | 413 | 507 | 491 | 27 | 348 | 419 | 407 | 392 |
| 11 | 399 | 419 | 555 | S207 | 28 | 371 | S439 | 504 | 524 |
| 12 | 400 | 453 | S197 | 491 | 29 | S369 | 431 | 504 | 509 |
| 13 | 411 | 462 | 520 | 508 | 30 | 353 | 370 | 526 | 516 |
| 14 | 371 | S___ | 563 | 510 | 31 | 347 | 352 | 532 | 533 |
| 15 | S378 | 234 | 562 | 521 | Total | 10,850 | 11,330 | 13,922 | 13,639 |
| 16 | 346 | 295 | 546 | 553 | | | | | |
| 17 | 403 | 408 | 541 | 547 | | | | | |

Note: S—Sunday.

During the years 1946 through 1949 Oxford's monthly soda pulp production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 4,175 | 4,106 | 4,320 | 3,654 |
| February | 3,695 | 3,746 | 3,369 | 3,325 |
| March | 4,263 | 4,056 | 3,237 | 3,222 |
| April | 4,096 | 3,960 | 4,448 | 3,027 |
| May | 3,806 | 4,235 | 4,765 | 3,170 |
| June | 3,400 | 4,006 | 4,510 | 3,254 |
| July | 3,602 | 3,690 | 3,923 | 3,313 |
| August | 4,171 | 3,966 | 4,090 | 4,117 |
| September | 4,133 | 4,141 | 3,935 | 3,779 |
| October | 4,416 | 4,540 | 4,025 | 4,575 |
| November | 4,555 | 4,207 | 4,062 | 4,330 |
| December | 4,169 | 3,946 | 3,614 | 3,905 |
| Total | 48,480 | 48,599 | 48,298 | 43,671 |

During the years 1946 through 1949 Oxford's monthly groundwood pulp production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 668 | 645 | 440 | 909 |
| February | 632 | 566 | 292 | 848 |
| March | 591 | 612 | 318 | 992 |
| April | 668 | 674 | 585 | 1,005 |
| May | 724 | 733 | 1,137 | 1,244 |
| June | 674 | 647 | 1,133 | 1,114 |
| July | 692 | 714 | 1,015 | 958 |
| August | 686 | 763 | 1,099 | 1,010 |
| September | 644 | 783 | 1,246 | 855 |
| October | 676 | 822 | 1,481 | 1,218 |
| November | 596 | 706 | 1,346 | 1,342 |
| December | 571 | 323 | 1,207 | 1,065 |
| Total | 7,822 | 7,992 | 11,299 | 12,560 |

During the years 1946 through 1949 Oxford's monthly combined sulphite production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 5,776 | 7,535 | 7,229 | 7,340 |
| February | 5,412 | 6,939 | 6,315 | 6,691 |
| March | 6,291 | 7,437 | 6,934 | 7,261 |
| April | 6,346 | 7,305 | 7,342 | 6,951 |
| May | 6,635 | 7,288 | 7,379 | 7,615 |
| June | 5,706 | 6,239 | 6,269 | 7,190 |
| July | 5,924 | 5,015 | 5,647 | 6,678 |
| August | 5,919 | 5,569 | 5,256 | 5,287 |
| September | 5,852 | 6,275 | 5,944 | 5,636 |
| October | 7,056 | 7,609 | 7,319 | 6,895 |
| November | 7,255 | 7,285 | 7,234 | 7,163 |
| December | 6,934 | 7,027 | 6,939 | 6,802 |
| Total | 74,906 | 81,523 | 79,797 | 81,509 |

During the years 1946 through 1949 Oxford's monthly chlorine production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 359 | 391 | 252 | 420 |
| February | 341 | 357 | 122 | 380 |
| March | 377 | 388 | 218 | 393 |
| April | 373 | 380 | 408 | 320 |
| May | 389 | 421 | 425 | 394 |
| June | 360 | 404 | 425 | 382 |
| July | 358 | 398 | 400 | 351 |
| August | 374 | 413 | 424 | 374 |
| September | 339 | 378 | 350 | 373 |
| October | 381 | 426 | 416 | 425 |
| November | 369 | 404 | 404 | 416 |
| December | 367 | 211 | 379 | 385 |
| Total | 4,387 | 4,571 | 4,229 | 4,613 |

During the years 1946 through 1949, Oxford's monthly caustic production in tons was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 405 | 440 | 284 | 473 |
| February | 383 | 402 | 137 | 429 |
| March | 424 | 437 | 246 | 443 |
| April | 420 | 429 | 453 | 360 |
| May | 438 | 475 | 479 | 444 |
| June | 406 | 456 | 478 | 431 |
| July | 403 | 448 | 451 | 396 |
| August | 421 | 466 | 478 | 421 |
| September | 382 | 426 | 401 | 420 |
| October | 430 | 479 | 469 | 479 |
| November | 416 | 455 | 455 | 469 |
| December | 413 | 238 | 427 | 433 |
| Total | 4,941 | 5,151 | 4,764 | 5,198 |

At all times material, Oxford's principal source of electric power was the Rumford Falls Power Company, hereinafter referred to as the Power Company, a wholly owned subsidiary of Oxford, which owned and operated hydroelectric generating facilities on the Androscoggin River in the vicinity of Oxford's mill at Rumford. The Power Company owned no other means of generating electric power and was wholly dependent on the flow of water in the Androscoggin River for its water supply. Oxford was the Power Company's principal customer; and it used, to the extent it needed, all the available

power remaining after the relatively small demands of the Rumford Falls Light Company, which serviced Rumford, and the demands of the Power Company itself had been met. No other electrical power producers served the Rumford area.

The Power Company had dammed the Androscoggin at Rumford Falls where a drop of 97 feet occurs. The water accumulated behind the dam is diverted through large penstocks and passed through turbines connected to generators of electricity. Below the falls, the water is drawn to the Middle Canal and used in the "Island Division" plant. After it passes through the Island Division, the water goes into the Low Canal and is used again on the 30-foot drop in the Oxford mill. During 1947 and 1948, the Power Company owned and operated four hydroelectric units in its plant at the falls, referred to as the Upper Station. The Power Company also operated for Oxford three hydroelectric units, two hydromechanical units, and two electric generators at the Island Division on the Middle Canal just below the falls. Oxford owned and operated two hydromechanical units and two grinder units at the Island Division and two hydroelectric and four hydromechanical wheels on the Low Canal at the mill. The power produced by all of this equipment and the amount produced by Oxford's steam turbine are combined with the power produced at the falls in computing the total amount of power produced by the power system.

In late 1941, Oxford completed the construction at its mill of a steam turbine electric power generator (referred to in the preceding paragraph). This turbine was fueled by pulverized coal and had a rated capacity of 7,500 kilowatts. Power generated by the steam turbine costs more to produce than did the other types of power used by Oxford, including that purchased from the Power Company. The turbine was installed as "standby" equipment, its only purpose being to provide a source of power when normal sources were insufficient to meet Oxford's needs. During the 69-month period commencing with December 1941 (the first month in which electric power was generated by the turbine) and ending with August 1947, the steam turbine produced electric power during 16 months. Such use was occasional and the power generated in the months involved ranged from 8,200 kilowatts in June 1945 to 1,715,800 kilowatts in February 1942.

A river flow is measured in cubic feet per second, representing the volume of water flowing past a point in one second of time. The Power Company measured the river flow of the Androscoggin River by calibrations of its water wheels. During the period 1946–1951, the combined hydroelectric and hydromechanical generating facilities of the Power Company and Oxford (exclusive of steam turbines) were capable of generating electric power, in kilowatt-hours, depending upon the usable river flow, as follows:

| Usable river flow | Total hydroelec. capabilities kw. | Total hydromechanical capabilities kw. | Combined hydroelec. and mechanical capabilities kw. | Usable river flow | Total hydroelec. capabilities kw. | Total hydromechanical capabilities kw. | Combined hydroelec. and mechanical capabilities kw. |
|---|---|---|---|---|---|---|---|
| 800 | 7,600 | 1,650 | 9,250 | 1,700 | 15,800 | 4,020 | 19,820 |
| 900 | 8,580 | 1,840 | 10,420 | 1,800 | 16,450 | 4,390 | 20,840 |
| 1,000 | 9,560 | 2,030 | 11,590 | 1,900 | 17,170 | 4,460 | 21,810 |
| 1,100 | 10,540 | 2,230 | 12,770 | 2,000 | 17,920 | 4,860 | 22,780 |
| 1,200 | 11,520 | 2,420 | 13,940 | 2,100 | 18,640 | 5,110 | 23,750 |
| 1,300 | 12,500 | 2,610 | 15,110 | 2,200 | 19,360 | 5,370 | 24,730 |
| 1,400 | 13,480 | 2,790 | 16,270 | 2,300 | 20,110 | 5,590 | 25,700 |
| 1,500 | 14,260 | 3,180 | 17,440 | 2,400 | 20,870 | 5,590 | 26,460 |
| 1,600 | 14,980 | 3,610 | 18,590 | | | | |

The above table includes the entire electric power available with the exception of the capacity of the steam turbine owned and operated by Oxford at its mill as standby equipment.

In June of 1948 Oxford completed construction of an additional steam turbine electric power generator with a rated capacity of 8,000 kilowatts, which had been begun in 1946, as a further source of electric power to meet its increased need for power.

During the years 1946 through 1949 Oxford's approximate average monthly use of power in kilowatt-hours,[3] exclusive of purchase of hydroelectric secondary power was as follows:

| Month | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|
| January | 22,100 | 21,750 | [1] 19,700 | [1] 26,450 |
| February | 21,050 | 23,500 | [1] 18,250 | [1] 26,600 |
| March | 21,750 | 22,750 | [1] 18,100 | [1] 27,550 |
| April | 21,700 | 23,800 | 25,300 | [1] 24,100 |
| May | 22,050 | 24,050 | 26,700 | [1] 23,800 |
| June | 21,050 | 24,000 | [1] 26,100 | [1] 23,400 |
| July | 20,700 | 23,500 | [1] 25,050 | [1] 22,000 |
| August | 21,650 | 24,950 | [1] 25,550 | [1] 22,300 |
| September | [1] 20,950 | [1] 23,600 | [1] 22,550 | [1] 23,100 |
| October | 19,450 | [1] 20,600 | [1] 22,550 | [1] 23,600 |
| November | 21,900 | [1] 21,900 | [1] 21,950 | [1] 25,400 |
| December | [1] 21,600 | [1] 18,750 | [1] 24,350 | [1] 24,750 |

[1] Includes electric power generated by steam turbine.

During the period from about October 1, 1947, to about March 17, 1948, the usable average river flow of the Androscoggin River was unusually low. Beginning with the first week of October 1947 and until March 18, 1948, the river flow was less than 1,700 cubic feet per second, except for a few days in November 1947 when a heavy rainfall temporarily increased the flow.

The extremely poor river flow experienced in 1947 and 1948 resulted from the drought in Maine during those years. The drought was brought on by an abnormal shortage of rain during the summers

[3] Averages computed by (1) taking actual metered figures for monthly totals of hydroelectric power generated and purchased, (2) dividing by number of days of production in that month, (3) dividing by 24 to convert to kilowatt-hours, and adding the average use of hydromechanical power determined from the above table showing assumed hydromechanical power capabilities of the system for varying hydroelectric power capabilities at given river flows. Since steam generated power bears no direct relation to river flow, the output of the steam turbine, in the months in which there was such output, is added in separately and is not included with hydroelectric power in arriving at a comparative hydromechanical figure.

of 1947 and 1948 and abnormally high temperatures during those years. From August 1, 1947, to the end of that year, the actual rainfall totaled approximately 9 inches (5 inches of which fell within a 2-week period in November), whereas the average rainfall during those months over the period 1894 to 1945 was 17 inches.

For the same period in 1947 the cumulative temperature variation was from about 200 degrees to 600 degrees above the 1894–1945 norm. During the period of January 1, 1948, to March 16, 1948, the precipitation was 4.2 inches, whereas the normal precipitation for that period was 8 inches. During the same period the cumulative temperature variation dropped to about 275 degrees below the norm, thus postponing normal spring thaws to a much later date.

The 1947–1948 drought conditions became so serious as to require the State of Maine to be proclaimed a disaster area by the President of the United States on October 25, 1947.

The abnormal lack of rainfall and high temperatures throughout the latter part of 1947 and throughout most of 1948 in the northern Maine region greatly reduced the amount of water runoffs into the rivers and into the lake storage system with the consequent reduction in the amount of river flow in the Androscoggin River available for use in the production of power.

During the 408 months from 1912 through 1946, the average monthly flow in the Androscoggin at Rumford dropped below 1,700 cubic feet per second for only 6 months; 2 of which were in the years 1921 and 1922 and 4 during the years 1941 and 1942. Other than for such months in those years and for the months in the years 1947 and 1948 the average monthly river flow greatly exceeded 1,700 cubic feet per second. The 1947–1948 drought was the most intense and prolonged in the experience of the Rumford area during the entire period from 1912 to 1948. The prior dry periods of 1929–1931 and 1940–1942 were of a much shorter duration and not as drastic.

During the period from October 11, 1947, to March 17, 1948, the drought resulted in a substantial reduction in the hydroelectric and hydromechanical power available to Oxford, and such power was often insufficient to meet Oxford's current demand for power during that period. The shortage during that period was the most drastic and longest continuous shortage of power in the experience of Oxford since 1913. At least a portion of the shortage was met by the use of Oxford's steam turbine.

During the period from October 1947 to March 17, 1948, the Oxford mill's operations were affected as a result of the aforementioned power shortages in the following manner:

(a) Beginning in September 1947 and continuing throughout most of the period thereafter until March 18, 1948, Oxford was required to produce expensive electric power for the mill by the operation of its emergency steam turbine because it was not getting enough power to operate the mill from its normal sources.

(b) As the amount of power available decreased below the mill's requirement, steps were taken in the following general order, to allocate available power in such a manner as to keep the most important equipment in operation as long as possible in an attempt to keep to a minimum the effect of the power shortage on mill operations:

(1) Certain of the mill's lights were turned off;

(2) electrical compressors were shut down;

(3) soda digester circulating pumps were shut down, resulting in a poorer pulp quality which required increased cooking time, fewer cooks in a day, less production and higher costs;

(4) certain beaters were taken out of operation, thereby reducing the amount of refining of pulp required to meet customer specifications;

(5) certain jordans were shut down;

(6) No. 11 paper machine engine was used to run electrochemical units instead of motor generator sets;

(7) The balance of the electrochemical plant was shut down and the mill had to use purchased chemicals in place of those normally manufactured by it;

(8) No. 1 sulphite circulation pump was shut down;

(9) No. "C" machine's constant line shaft motor was shut down;

(10) No. 2 machine's constant line shaft motor shut down;

(11) No. "B" machine's constant line shaft motor shut down;

(12) Groundwood mill shut down, forcing the mill to substitute the more expensive semi-Kraft pulp for groundwood pulp;

(13) Nos. 7, 8, A, B, C, five paper machines shut down in that order; and

(14) Supercalenders shut down.

(15) An unspecified number of additional pieces of equipment were also shut down along with the above major equipment.

(c) From time to time during such period in 1947 and 1948 some or all of such steps had to be taken because of the power shortage.

(d) As a result of shutting down the electrochemical plant, which, under normal conditions produced substantially all of Oxford's requirements of chlorine and caustic soda, Oxford purchased chemicals on the open market to make up such shortages for the months of December 1947 and January, February, and March of 1948.

(e) As a result of shutting down the groundwood pulpmill and the shutdown of equipment in the soda and sulphite pulpmill, Oxford was unable to produce all its requirements of those pulps. Under normal circumstances, it had an excess available for sale at a wholesale value of $114 per ton. It purchased pulps on the open market to make up the shortages for the months of December 1947 and January, February, and March of 1948.

(f) The above interruptions of mill operations caused an increase in the cost of manufactured groundwood pulp and an increase in

the cost of manufacturing of paper due to the required substitution of the more expensive soda pulp in lieu of manufactured groundwood pulp for the months of December 1947 and January, February, and March of 1948.

(g) Mill operations were further interrupted to the extent that paper machines were operated at reduced speeds and, at various times during the months of December 1947 and February and March of 1948, were actually shut down resulting in the loss of paper production which had a wholesale value of about $190 per ton in 1947 and 1948.

During the drought period, Oxford's steam generator was used to produce the following power:

| Period | Actual average kws. per hour | Period | Actual average kws. per hour |
|--------|------------------------------|--------|------------------------------|
| Oct. 1–10 | 4,610 | Jan. 1–31 | 5,280 |
| Oct. 11–31 | 5,800 | Feb. 1–29 | 3,690 |
| Nov. 1–30 | 4,230 | Mar. 1–17 | 4,470 |
| Dec. 1–31 | 4,800 | | |

The turbine's average production for each of the above periods includes times when it was not operating at all, or was operating at a reduced level because of mechanical difficulties. It required several hours to bring the turbine up to full production and likewise several hours for cooling off after its use ceased.

During December of 1947 and February and March of 1948, Oxford was unable to maintain its estimated and budgeted rate of paper production; and failed to produce tons of paper, the production of which had been estimated and budgeted for on the basis of its current capacity for production, as follows:

| Month | Estimated and budgeted finished paper production [4] | Estimated loss of finished paper production [5] | Actual production of finished paper |
|-------|--------|--------|--------|
| December 1947 | 12,107 | 753.55 | 11,330 |
| February 1948 | 12,270 | 771.00 | 11,680 |
| March 1948 | 12,656 | 1,791.20 | 10,755 |

During the drought period, Oxford had to purchase various amounts, in tons, of chlorine, caustic, and groundwood pulp to replace the amounts that it had estimated and budgeted would have been produced by itself had sufficient power been available, as follows:

| Month | Chlorine purchased | Caustic purchased | Groundwood pulp purchased |
|-------|--------|--------|--------|
| December 1947 | 168.71 | 188.94 | 30.91 |
| January 1948 | 165.99 | 186.89 | 0 |
| February 1948 | 249.54 | 281.16 | 9.36 |
| March 1948 | 154.42 | 174.03 | 53.25 |

[4] Combined figures for coated and uncoated paper.
[5] Rough paper production reduced by estimated shrinkage loss of 8 per cent.

Oxford's comparative earnings, before adjustment by respondent, for the years 1942 through 1951, are as follows:

| | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $13,071,375.99 | $16,512,872.77 | $19,131,787.45 | $19,708,960.99 | $23,270,388.08 | $29,261,056.60 | $32,478,671.42 | $30,882,988.49 | $36,971,098.53 | $44,059,124.86 |
| Cost of sales | 11,456,206.80 | 14,441,137.15 | 16,869,571.18 | 17,631,998.40 | 20,615,519.25 | 24,458,770.66 | 28,909,225.50 | 27,617,527.88 | 31,357,894.58 | 36,113,141.17 |
| Gross profit on sales | 1,615,159.19 | 2,071,735.62 | 2,272,216.27 | 2,076,962.59 | 2,654,868.83 | 4,802,285.94 | 3,569,445.92 | 3,265,460.61 | 5,613,203.95 | 7,955,983.69 |
| Selling and general expense | 717,202.84 | 772,025.76 | 624,233.35 | 692,536.95 | 771,550.19 | 845,171.23 | 906,141.10 | 974,111.34 | 1,009,277.85 | 1,206,464.94 |
| Operating profit | 897,966.35 | 1,299,709.86 | 1,647,982.92 | 1,384,425.64 | 1,883,318.64 | 3,957,114.71 | 2,663,304.82 | 2,291,349.27 | 4,603,926.10 | 6,749,518.75 |
| Other income—net | 115,648.67 | 28,601.00 | 17,436.24 | (−7,199.81) | 31,566.86 | 81,210.85 | 13,414.15 | 4,113.48 | 90,684.91 | 53,074.01 |
| Profit before interest on funded debt | 1,013,615.02 | 1,328,310.86 | 1,665,419.16 | 1,377,225.83 | 1,914,885.50 | 4,038,325.56 | 2,676,718.07 | 2,205,462.75 | 4,694,611.01 | 6,802,592.76 |
| Interest on funded debt | | | | | 110,043.36 | 227,842.17 | 209,272.57 | 196,049.94 | 231,649.92 | 209,084.06 |
| Earnings on operations before special items and Federal taxes | 1,013,615.02 | 1,328,310.86 | 1,665,419.16 | 1,377,225.83 | 1,804,842.14 | 3,810,483.39 | 2,467,446.40 | 2,009,412.81 | 4,462,961.09 | 6,593,508.70 |
| Dividends received from subsidiaries | 60,000.00 | 60,000.00 | 86,807.08 | 30,000.00 | 160,000.00 | 710,000.00 | 460,000.00 | 60,000.00 | 280,000.00 | 620,000.00 |
| | 1,073,615.02 | 1,388,310.86 | 1,752,226.24 | 1,407,225.83 | 1,964,842.14 | 4,520,483.39 | 2,927,446.40 | 2,159,412.81 | 4,742,961.09 | 7,213,508.70 |
| Extraordinary charges: | | | | | | | | | | |
| Reserved for non-current receivables | 327,186.00 | | | | | | | | | |
| Loss from expropriation of Cape Breton Timberland | | | | | | | | | | |
| Reserve for post war adjustments | | 49,000.00 | 101,000.00 | | | | | | | |
| Net earnings before Federal taxes | 746,429.02 | 1,339,310.86 | 1,651,226.24 | 1,407,225.83 | 1,964,842.14 | 4,520,483.39 | 2,927,446.40 | 2,159,412.81 | 4,742,961.09 | 7,213,508.70 |
| Federal taxes on income | 271,100.00 | 797,900.00 | 960,000.00 | 729,000.00 | 726,000.00 | 1,494,400.00 | 946,900.00 | 750,000.00 | 1,979,800.00 | 4,260,000.00 |
| Net earnings to surplus | 475,329.02 | 541,410.86 | 691,226.24 | 678,225.83 | 1,248,842.14 | 3,026,083.39 | 1,980,546.40 | 1,409,412.81 | 2,763,161.09 | 2,953,508.70 |

Oxford's normal production, output, or operation for either 1947 or 1948 was not interrupted or diminished because of the occurrence, either immediately prior to, or during such years, of events unusual and peculiar in Oxford's experience.

OPINION.

In computing its excess profits tax for the years 1950 and 1951, the petitioner claims the benefit of section 442, relating to abnormalities during the base period (1946–1949). Insofar as here applicable, the requirements of section 442 under which the petitioner must establish its qualification for relief are as follows:

SEC. 442. AVERAGE BASE PERIOD NET INCOME—ABNORMALITIES DURING BASE PERIOD.

(a) IN GENERAL.—If a taxpayer which commenced business on or before the first day of its base period establishes that, for any taxable year within, or beginning or ending within, its base period:

(1) normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during such taxable year, of events unusual and peculiar in the experience of such taxpayer, or

(2) the business of the taxpayer was depressed because of temporary economic circumstances unusual in the case of such taxpayer,

the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable. * * *

The petitioner here claims qualification solely under section 442(a)(1) and not under (a)(2). Moreover, the parties agree and the facts substantiate that the petitioner commenced business on or before the first day of its base period, as required by the section.

Taxpayers which qualify under section 442(a) are entitled to relief computed under subsequent subsections. The computation of the amount of such relief is automatic in nature, involving the use of industry base period rates of return provided by section 447. In this connection, brief reference to the legislative history of section 442 is useful to an understanding of the nature and purpose of the relief provisions under the so-called Korean war excess profits tax.

In its report on the Excess Profits Tax Act of 1950,[6] the Committee on Finance stated, in part:

9. General relief

(a) Provisions of World War II law.—Section 722, the general relief provision of the World War II law, was designed to aid hardship cases by providing such corporations with a substitute, or constructive average, base period net

---

[6] S. Rept. No. 2679, 81st Cong., 2d Sess. (1950), pp. 17ff. See, also, the Report of the Committee on Ways and Means, H. Rept. No. 3142, 81st Cong., 2d Sess. (1950), p. 15ff.

income.   Section 722 dealt with three principal classes of cases—(1) corporations which had suffered some adversity during their base period, (2) corporations which had made changes during the base period resulting in an increase in their profit potentials, and (3) corporations which were not in existence during the base period and, therefore, had no base period net income at all.

In each instance the section provided that a hypothetical base period earnings credit be "tailor made" for the particular taxpayer and that certain assumptions be made in connection with the case.   Each case was a problem in research, and the legal or tax result generally was intertwined with complicated accounting and economic problems.   Almost every factor which had any influence on the particular business was pertinent to the case and the time and expense involved in reconstructing the average base period earnings credit were tremendous.

These complex relief provisions of the World War II law have resulted in extended delay in the settlement of relief claims which discriminated against taxpayers who had neither the time nor the financial resources necessary for the establishment of their cases.   Moreover, the determination of what the taxpayer's base period income would have been in the absence of the claimed abnormality was largely a matter of subjective judgment, and a great deal of complaint has arisen on this account.   Hence this bill reduces to a minimum the amount of administrative discretion involved in the adjustment of the hardship cases which may be expected to arise under an excess profits tax.

\* \* \* \* \* \* \*

(c) General relief provisions in the bill.—The bill provides autotmatic formulas for each of the most important types of cases which arose under section 722 of the World War II law.   These formulas permit an objective computation of the amount of relief granted in each case, thus avoiding the practice of making the extent of the relief dependent upon an attempted analysis of all the varying factors in the individual case with the resulting uncertainty, delays, and disparity of treatment among taxpayers which characterized tthe application of the general relief provisions of the World War II law.

(i) Abnormalities during the base period

Section 722(b)(1) and (2) of the prior law provided relief when the income of the taxpayer's base period years was substantially abnormal because of a physical interruption to production, such as a fire, strike, or flood, or because of a depression in the business of the taxpayer resulting from temporary economic circumstances unusual in the case of the taxpayer, such as a severe price war.   Your committee's bill provides relief in these same areas.   However, the bill does not retain that part of section 722(b)(2) which provided relief in cases where the business of the taxpayer was depressed because the industry of which the taxpayer was a member was depressed due to temporary economic events unusual to such industry.   Provision is made in another portion of the bill for the relief of taxpayers whose industry was depressed during the base period.

There is no doubt but that the drought in Maine in the latter part of 1947 and the early part of 1948 is the type of abnormality with respect to which section 442 is designed to provide relief.   This conclusion is borne out by the language of the committee report quoted above and likewise by the respondent's regulations [7] wherein it is stated:

---

[7] Regs. 130, sec. 40.442–2(a)(3).

Unusual and peculiar events contemplated in section 442(a)(1) consist primarily of physical rather than economic events or circumstances. Such physical events include floods, fires, explosions, strikes, and other exceptional and uncommon circumstances hindering production, output, or operation.

Moreover, we are satisfied that the drought was so severe as to constitute an event "unusual and peculiar in the experience of such taxpayer," as required by the statute. Of course, any paper manufacturer dependent for its mill operation upon waterpower must expect that the operation will be affected adversely from time to time by water shortages. Nevertheless, the facts disclose that the drought in question here was of greater intensity and of longer duration than any other that Oxford had experienced during its considerable history.

A far more difficult question is presented by the determination of whether, for either 1947 or 1948, Oxford's "normal production, output, or operation was interrupted or diminished" because of the drought. While the statute provides automatic procedures for the determination of the amount of relief to which an eligible taxpayer is entitled, the statute is less effective in this regard with respect to the eligibility tests. In commenting upon this fact in its report on the Revenue Act of 1951,[8] the Finance Committee stated:

These tests frequently may involve extremely difficult evidentiary problems, particularly with respect to a determination of the extent that any single event has affected the taxpayer's normal production, output or operation.

However, the report continues:

The philosophy upon which the existing relief provisions, including section 442, were developed was that automatic formulas, both as to eligibility requirements and as to the extent of the relief granted, are preferable to the approach of the World War II law with its requirement of subjective analysis and decision. Your committee believes it is desirable to maintain this approach of present law. * * *

The petitioner claims that normal production, output, or operation is what it would have produced with its facilities as they then existed (at the time of the abnormality) but for the effect of the abnormality. Thus, the petitioner maintains that it is not proper to compare actual production figures for the drought-affected months with actual production figures for prior months because the latter would not include the production potential of such new equipment as No. 11 paper machine which did not start producing on its "rebuilt" basis until February of 1947 and did not reach full capacity until sometime later, not clearly ascertainable from the record. In effect, the petitioner "reconstructs" what it considers its production would have been in the absence of the claimed abnormality and then

---

[8] S. Rept. No. 781, 82d Cong., 1st Sess. (1951), pp. 76, 77.

treats the reconstructed production as "normal" for the purpose of establishing a departure from normal.

The theory advanced by the petitioner requires the very type of "reconstruction" which lay at the heart of section 722 and which was rejected explicitly by the Congress in its development of the general relief provisions of the Korean war excess profits tax. It is contrary to the philosophy implicit in those provisions. Moreover, it is clearly contrary to the respondent's regulations [9] which provide as follows:

Normal production, output, or operation, means the level of production, output, or operation customary for the taxpayer, determined on the basis of the actual experience of the taxpayer up to the time the unusual and peculiar event occurred.

In view of the rather general language of the statute with respect to eligibility and in light of the congressional intention to impart certainty, insofar as practical, to the relief provisions of the 1950 Act, the specific language of the regulations quoted above is reasonable and a valid exercise of the regulatory power. Indeed, the petitioner does not question its validity. The regulations [10] likewise provide that "[t]he interruption or diminution must be significant and not trivial."

The respondent would have us find that any production losses which may have occurred in the drought months were due to inefficient utilization of facilities, primarily the petitioner's failure to operate the steam turbine at full rated capacity. Thus, in his computations of the amount of power which the petitioner actually had available during the drought months, as compared to what it actually employed, the respondent includes the turbine at its rated capacity of 7,500 kilowatts. The "rated capacity" is presumably the capacity attached to the machine by its manufacturer at the time of its installation. Such a figure is not a realistic measure of true capacity in 1947–1948. The record amply supports the petitioner's contention that every effort was made to utilize to the fullest extent the practical capacity of the turbine.

The welter of computations and reconstructions submitted by the parties to show theoretical power availabilities, actual power consumptions, the excess of one over the other, and so forth, may be useful in determining the effects of the drought upon Oxford's operations during the period October 11, 1947, to March 17, 1948, and, thus, in establishing whether during that time there was an interruption or diminution in production, output, or operations of which the drought was the proximate cause. However, we are convinced that the statute requires something more than this.

---

[9] Regs. 130, sec. 40.442–2(a)(1).
[10] Regs. 130, sec. 40.442–2(a)(2).

Section 442(a) requires unequivocally that a taxpayer seeking its benefit establish that its normal production, output, or operation *"for any taxable year"* within the base period was interrupted or diminished. It is true that the phrase "for any taxable year" appears in the introductory clause alone, but its location is due presumably to the usual drafting technique of placing in such an introductory clause all elements common to the subordinate parts in order to avoid their unnecessary repetition therein. Giving effect to the plain meaning of these words, as applied to the facts before us, Oxford must establish that its production was less than normal in either 1947 or 1948, or both, *considering each year as a whole.*[11]

This construction is in accord with our Opinion in *Fulton Foundry & Machine Co.*, 26 T.C. 953 (1956), the only other case involving section 442 to be considered by this Court. In that case, we had before us a similar question involving the existence of an interruption or diminution of normal production, output, or operation. Implicit in our entire discussion of that issue was the assumption that the issue turned upon a comparison of production of 1 year as a whole with that of other years. For example, we declared (at p. 957):

For all that the record shows, what petitioner produced in the critical year 1947 was normal for it. If we take the fiscal years 1945, 1946, 1948, and 1949, constituting 2 years on each side of the one in question,³ we find that the average production in tons (the only unit of production available to us) was about 6,410, whereas the production during 1947 was over 6,900. There is no indication here that petitioner's 1947 production was less than normal. The same result follows if we compare the 1947 production with any other years shown by the record, except the fiscal year 1946. But on these figures there is much more reason to believe that that year was above normal than that all the other years were below.⁴ * * * [Footnotes omitted.]

Any other construction of the statute would lead to such anomalous results as to be patently absurd. It does not follow from the occurrence of an abnormality during a year that the year as a whole was abnormal. Indeed, a taxpayer may have suffered an abnormal interruption or diminution of its production, output, or operations at some point during a particular year and yet that year as a whole may still prove the most successful in the taxpayer's history. It is inconceivable that Congress intended that a taxpayer be entitled to the benefit of relief in such a case. In this connection, it must be recalled that the amount of relief available under the Korean war excess profits tax is not arrived at by a reconstruction of what the

---

[11] That Congress had in mind the adjustment of abnormalities affecting a *year or years* is made clear by the report of the Ways and Means Committee which states at page 53:

"Corresponding in scope generally to section 722(b)(1) and (2) of the prior excess profits tax law, section 442 is a relief measure which provides a means for adjusting certain abnormalities in the taxpayer's net income for a base period year or years." (H. Rept. No. 3142, *supra.*)

taxpayer would have earned absent the claimed abnormality. If such were the case, it might be argued that, even in the example referred to above, the taxpayer would only receive the benefit of earnings which were theoretically normal in any event. However, under the statute before us, the amount of relief is computed automatically on the basis of the actual rate of return for the period involved of the taxpayer's industry classification, a rate of return which bears only an arbitrarily assumed relationship to the taxpayer's actual experience.

Assuming, *arguendo*, that petitioner has established an interruption or diminution in its normal production during *part* of 1947 and part of 1948, as a result of the drought, we are satisfied that petitioner has failed to establish that its total production in either of those years was not substantially normal when measured against its actual experience. Moreover, it is comparative production and not profits which determines eligibility. *Fulton Foundry & Machine Co., supra.* In the instant case, production is best measured in terms of the production of finished paper, petitioner's principal product. (Relative production of other selected products is not substantially different.) As set forth in our Findings of Fact, Oxford's actual production of finished paper in tons was greater in 1947 than in 1946, greater in 1948 than in 1947, and greater in 1949 than in 1948. Expressed as percentages, it will be found that paper production in 1947 increased about 6 per cent over 1946; that in 1948 increased about 13 per cent over 1947; and that in 1949 increased about 2 per cent over 1948.

On these facts alone, we could not find that either 1947 or 1948 was below Oxford's normal experience. However, as we have pointed out, petitioner seeks to overcome this evidence by reconstructing what Oxford would have produced with its facilities as they then existed and then comparing such reconstructed production with actual production. Entirely aside from the speculative character of the reconstruction, we reject petitioner's approach as contrary in principle to the announced intention of Congress, as implemented by the applicable regulations, to avoid just such evidentiary problems.[12]

In rejecting the petitioner's contention, we do not necessarily preclude the possibility that under particular circumstances the facts may so establish the existence of a pattern of growth[13] that pro-

---

[12] Cf. *Burford-Toothaker Tractor Co.* v. *United States,* 262 F. 2d 891 (C.A. 5, 1959), where the court remarked:

"This approach is both highly unrealistic in the frame of this record and is an impermissible inoculation of the administrative process with the metaphysical subjective imponderables in Old Section 722 which Congress rejected as unworkable and unfair when, for the Korean Excess Profits Tax Bill, an automatic objective formula was prescribed."

[13] Section 444 provides relief in cases of increases in capacity for production or operation.

duction in one year, although higher than that in prior years, may be below "normal" in the sense that it represents a substantial departure from the pattern established by the taxpayer's actual experience. However, in the instant case, while the facts disclose a growth of Oxford's business throughout the base period (and continued into the excess profits period), there is no discernible pattern upon which to base such a conclusion.

We hold that petitioner has failed to establish that, for either 1947 or 1948, its normal production, output, or operation was interrupted or diminished for the purpose of section 442(a)(1). In view of this holding, it is unnecessary to consider whether petitioner computed its relief under the proper subsection.

*Decision will be entered for the respondent.*