OXFORD PAPER COMPANY, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5, Docket 26314.

United States Court of Appeals Second Circuit.

Argued Feb. 23, 1962.

Decided April 19, 1962.

Petition by Commissioner for Rehearing Denied June 12, 1962.

Thomas N. Tarleau, New York City (Willkie, Farr, Gallagher, Walton & FitzGibbon), New York City (Robert B. Hodes and Nicholas J. Sheppard, New York City, on the brief), for petitioner.

Harry Marselli, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C.), for respondent.

White & Case, New York City (A. Chauncey Newlin and Edmund W. Paven-

stedt, New York City, of counsel), submitted brief as amicus curiae.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

Taxpayer's petition for review of a decision of the Tax Court, 33 T.C. 943 (1960), denying its petition to annul the Commissioner's determination of a deficiency in excess profits tax for 1950 and 1951, raises a number of questions with respect to the relief provisions of § 442 (a) (1) of the Internal Revenue Code of 1939, added by the Excess Profits Tax Act of 1950, 64 Stat. 1137, 1163 (1951), 26 U.S.C.A. Excess Profits Taxes, § 442 (a) (1). We hold that taxpayer made out a case entitling it to certain relief. Accordingly we reverse and remand for a determination of the amount.

Petitioner, Oxford Paper Company, is a Maine corporation with its principal office in New York City. Its chief products are paper and woodpulp. These are produced in an integrated mill operation on the Androscoggin River at Rumford, Maine, which is complete from the processing of logs to the output of finished paper, and includes the production of pulps and chemicals needed at intermediate stages of the process. In its income and excess profits tax returns for the years ending December 31, 1950, and December 31, 1951, Oxford claimed that, due to a severe drought and consequent shortage of hydroelectric and hydromechanical power in the excess profits tax base years of 1947 and 1948, it was entitled to relief under § 442(a) (1), set out in the margin.[1]

Following the procedure prescribed by § 442, Oxford first eliminated, pursuant to § 442(b) (2) (A), the base period year 1949 as "the 12 consecutive months the elimination of which produces the highest remaining aggregate excess profits net income * * *," a benefit to which it would have been entitled, under § 435 (d) (2), even if no abnormality had occurred. Examination of the months remaining caused Oxford to conclude that § 442(d) governed its computation of substitute excess profits net income; pursuant to this section, it redetermined its average base period income by applying the industry rate of return for "paper and allied products," see § 447, to the average of the amounts of its total assets on the last day of each of the four base period years, with resulting substantial increases. The constructive figure thus obtained exceeded 110% of the actual average base period income, as § 442(d) required as a condition to eligibility for relief. Believing that Oxford had not met the requirements of § 442(a) (1), the Commissioner disallowed the claim for relief, recomputed Oxford's base period net income by using the reported figures, and assessed excess profits tax deficiencies for 1950 and 1951 in the respective amounts of $153,959.75 and $402,847.03. The Tax Court upheld the Commissioner.

The facts set out hereafter are derived from stipulations, findings of the Tax Court with sufficient support in the record, and undisputed evidence introduced by Oxford. During the latter part of 1947 and early 1948, a severe drought in Maine so diminished the flow of the Androscoggin River, Oxford's source of energy for hydroelectric and hydromechanical power, as to make impossible the generation of power adequate for Oxford's needs. The drought was so serious that President Truman proclaimed Maine a disaster area on October 25, 1947. The

---

1. "§ 442. Average base period net income—abnormalities during base period.

"(a) In general. If a taxpayer which commenced business on or before the first day of its base period establishes that, for any taxable year within, or beginning or ending within, its base period:

"(1) normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during such taxable year, of events unusual and peculiar in the experience of such taxpayer * * *

"the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable."

power shortage caused a loss in Oxford's production of finished paper in December, 1947, and in February and March, 1948, estimated by the mill manager in reports made at the time to be about 2170 tons, which represented a wholesale value of about $412,000 and would have produced an estimated profit of $37,400.[2] Demand for Oxford's products during this period was sufficient that all of the lost production could have been sold at the going market price. To make the most effective use of what power it did have, Oxford made a number of adjustments in its productive process; these are set out in full in the Tax Court's opinion, 33 T.C. at 953–955. Only one such change had a direct effect on the volume of its sales: The groundwood mill was shut down, necessitating use of soda pulp, which Oxford otherwise would have sold, in the production of paper. This loss amounted to approximately 1564 tons of soda pulp, equal to $178,296 in gross value and about $38,300 in profits. Total lost profits due to decline of production were thus $75,700.

The cost effects of the power shortage were several.[3] Throughout the drought the diminished power supply was augmented by the operation of an expensive steam turbine at the mill, a measure which increased Oxford's power costs by around $161,800 over those for the same amount of hydroelectric power. From December, 1947 through March, 1948, Oxford purchased on the open market some 739 tons of the chlorine, 831 tons of the caustic soda, and 94 tons of the groundwood pulp that it ordinarily produced itself for use in the manufacture of finished paper. These purchases, necessitated by the lack of the electric power needed to produce the raw materials, resulted in increased costs of about $79,-400. In addition, the groundwood pulp that Oxford did produce cost about $20,-500 more than normal, and the forced substitution of the more expensive soda pulp for the unfilled portion of the groundwood pulp requirements caused about $51,700 in abnormal costs. The total increase in costs was therefore about $313,400.

The Tax Court found, 33 T.C. at 958–959, and the Commissioner concedes, that the drought was an event "unusual and peculiar in the experience" of the taxpayer, within § 442(a) (1). See Regulations 130, § 40.442–2(a) (3). Likewise the Commissioner does not contend, as he did unsuccessfully in Burford-Toothaker Tractor Co. v. United States, 262 F.2d 891, 892–893 (5 Cir. 1959), that taxpayer failed to prove a causal relation between that event and the decreases in production and increases in costs we have recounted. Compare 7A Mertens, Law of Federal Income Taxation (Zimet & Weiss rev. 1955) § 42.108, at pp. 533–534, with Alexander, General Relief Provisions of the Excess Profits Tax Act of 1950, 60 Yale L. J. 395, 402–403 (1951). His contention is rather that the facts proved by the taxpayer did not measure up to the showing of an interruption or diminution in "normal production, output, or operation" which § 442(a) (1) requires if relief is to be available.

The regulations promulgated by the Commissioner under § 442(a) (1) define normal production etc. as "the level of production, output, or operation customary for the taxpayer, determined on the basis of the actual experience of the taxpayer up to the time the unusual and peculiar event occurred," Regulations 130, § 4.442–2(a) (1). The parties are in sharp conflict whether the "normal production, output, or operation" refer-

---

2. The Tax Court, accepting Oxford's budgeted production for the months in question as a benchmark, found the loss in production to total 3315.75 tons, 33 T.C. at 955. This amount represented a wholesale value of about $630,000 and would have netted approximately $55,000 in profits.

3. These cost figures are derived from monthly production reports made by the mill manager to his superior in the New York office. During the power-shortage period, these reports included careful estimates of the increase in costs attributable to the lack of power, as well as detailed explanation of increases in cost not so explicable.

red to in § 442(a) (1) includes a level attainable with increased capacity which a taxpayer had available during the period of the abnormality. Oxford argues for an affirmative answer, at least where the demand would have permitted the taxpayer to utilize all its capacity as Oxford concededly would have done. The Commissioner contends that the existence of expanded capacity is irrelevant and that there can be no finding of interruption or diminution of "normal" production where, as here, the taxpayer's actual sales in the years claimed to be abnormal exceeded those for the year preceding the abnormality. The Tax Court, 33 T.C. at 962–963, rejected Oxford's contention without going all the way with the Commissioner. Although the Tax Court did "not necessarily preclude the possibility that under particular circumstances the facts may so establish the existence of a pattern of growth that production in one year, although higher than that in prior years, may be below 'normal' in the sense that it represents a substantial departure from the pattern established by the taxpayer's actual experience," it found that "in the instant case, while the facts disclose a growth of Oxford's business throughout the base period (and continued into the excess profits period), there is no discernible pattern upon which to base such a conclusion."

We find no basis for the glosses which the Commissioner and the Tax Court would impose upon what seems the straightforward language of the statute. To us "normal" means what would have occurred but for the "unusual and peculiar events" that produced the deviation from the norm. Indeed, the Commissioner himself properly recognized this in his regulations under the similar language of § 722(b) (1) of the World War II Act, Regulations 112, § 35.722–3(a):

"Normal production, output, or operation means the level of production, output, or operation which would have been reached by the business of the taxpayer had the unusual and peculiar events not occurred."

For the contrary result that has been reached here, both the Commissioner and the Tax Court rely on the point that whereas § 722 of the World War II Excess Profits Tax, 26 U.S.C.A. Excess Profits Taxes, § 722 required a taxpayer seeking relief on the basis of interruption or diminution of normal production, operation or output because of unusual or peculiar events, or on other grounds recognized by that section, to make a complete reconstruction of normal earnings, a process difficult, speculative, and time-consuming, Congress directed in the Korean Act that the amount of relief granted by § 442 should be determined as automatically as possible, by providing that the earnings to be substituted would be determined by multiplying the taxpayer's total assets at the relevant time by an average industry rate of return, and applying the 110% requirement of § 442(d). See H.R.Rep.No.3142, 81st Cong., 2d Sess. (1950), pp. 15–17 (1951–1 Cum. Bull. at pp. 197–198); S.Rep.No.2679, 81st Cong., 2d Sess. (1950), pp. 17–18 (1951–1 Cum.Bull. at pp. 251–252); S. Rep.No.781, 82nd Cong., 1st Sess. (1951), pp. 76–77 (1951–2 Cum.Bull. at pp. 512–513). However, Congress allowed the test for eligibility with which we are here concerned to remain substantially the same as in the previous law. Section 722(b) (1) of the World War II Act granted relief if the "average base period net income is an inadequate standard of normal earnings because—(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer." Reading this against § 442(a) (1), we can see no significant change in the latter, save that the World War II Act would have taken cognizance of an unusual event occurring immediately prior to the base period that did not have its effect until a year later whereas the Korean Act would not—an event itself probably quite unusual and certainly not the claim here.

We are unable to accept the argument that the Korean Act's simplification of the reconstruction of net income for a year in which a taxpayer was entitled to relief under § 442(a) (1) somehow altered the criteria for determining whether he was so entitled, when Congress left the language almost precisely as it had been; we cannot properly assume that Congress intended the same words to mean something different than before without clearer instructions than anything Congress has given here. Where Congress wished a more "automatic" method to be adopted under the Korean Act, it made careful provision to that end; its doing this in some instances affords no warrant for the Commissioner's supplementing its effort in others where Congress was evidently content with its previous handiwork. Moreover, it is a good deal easier to speak generally of an "automatic" application of § 442(a) (1) than to say what such application should be. Thus we may wonder whether the Commissioner could conscientiously subscribe to an "automatic" application of § 442(a) (1) in a case where, despite a temporary cessation of operation due to an unusual or peculiar event and a volume lower than the previous year, the evidence clearly showed that the taxpayer had produced all the goods for which a market existed, or, indeed, that a vanishing back-log would have forced a shut-down if the unusual and peculiar event had not. To distinguish such cases on the basis that the unusual and peculiar event would not have "caused" an interruption or diminution in "normal" production is to admit that § 442(a) (1) does not enact a rigid formula but must be interpreted and applied to the facts of each case. Indeed, the Senate Finance Committee seems to have recognized this rather clearly in 1951, when, in connection with an amendment adding to § 442 an alternative provision, § 442(h), which was truly automatic, the Committee said that the existing provisions "frequently may involve extremely difficult evidentiary problems, particularly with respect to a determination of the extent that any single event has affected the taxpayer's normal production, output or operation." S.Rep.No. 781, supra, pp. 76–77 (1951–2 Cum.Bull. at p. 512). Neither does the presence of a special provision, § 444, entitling complying taxpayers to special relief for increases in capacity meeting the test of that section, mean that increases not meeting that test must be ignored when relief is claimed under § 442(a) (1); § 722(b) (4) of the World War II Act contained, among other things, a provision to this same effect. Hence, if the reference in Regulations 130, § 40.442–2 (a) (1), to "the actual experience of the taxpayer up to the time the unusual and peculiar event occurred" would prevent consideration of increased capacity that would have been used but for the "unusual and peculiar event," we should be obliged to consider it invalid.

However, decision of this issue in Oxford's favor is far from ending the case, as both parties at times rather seem to assume. Accepting Oxford's position that inability to utilize increased capacity is relevant, it must still be determined whether "normal production, output, or operation was interrupted or diminished."

Of the seven items of increase in Oxford's productive capacity set out in the Tax Court's opinion, 33 T.C. at 946–947, the only important addition to capacity whose "start-up" date preceded the power shortage was the rebuilt No. 11 paper machine;[4] the rest were put into operation after the shortage ended. In the absence of any showing that those which began operation only after the cessation of the power shortage would have started up earlier but for that shortage, there is no reason to take any addition save the No. 11 paper machine into account. Indeed, Oxford's own figures, which the

4. This was put into service on February 1, 1947. Three forced circulation sulphite digesters, constituting a relatively minor capital expenditure, were added during July, August, and September, 1947.

Tax Court accepted, did not go beyond this. The percentage loss in physical production was thus correctly estimated at the rather meager level which the figures already given have indicated and which will appear in more detail later on.

Oxford says the smallness of these figures is without consequence since the only showing required by the statute is (i) that an unusual event interrupted or diminished normal production etc. in some degree, and (ii) that the industry rate of return on the taxpayer's assets exceeded 110 percent of his actual net income for the affected period, §§ 442(c) (3) and 442(d). The Regulations, however, demand in addition that "the interruption or diminution must be significant and not trivial," Regulations 130, § 40.442–2(a) (2). Oxford's position, in effect, is that the 110% requirement is the sole permissible test of substantiality. Although the House and Senate reports show that the 110% requirement was deemed "desirable in order to avoid burdening the administration of the tax with trivial claims," H.R.Rep.No.3142, supra, p. 17 (1951–1 Cum.Bull. at 198), S. Rep.No.2679, supra, p. 19 (1951–1 Cum. Bull. at 253), and a statement of Senator George, Chairman of the Senate Finance Committee, 96 Cong.Rec. 16770 (1950), if read literally, would support Oxford's position, we cannot believe Congress meant to deprive the Commissioner of all further ability to give the statute a sensible application. Under Oxford's construction a marginal firm whose "normal" income was far below 10/11ths of the industry average might reap a windfall from an unusual and peculiar" event preventing production for only a few days. The Commissioner's requirement that "the interruption or diminution must be significant and not trivial" is appropriate to prevent aberrations of this sort, whatever the difficulties in its application may be, see Tarleau, Commentary on General Relief under the Excess Profits Tax Act of 1950, 50 Mich.L.Rev. 365, 379 (1952). Approval of this reg-

ulation by no means renders the 110% restriction superfluous—a more successful member of the industry who suffers significantly from a qualifying event will be impaled on it unless the event brings his rate of return sufficiently below the industry average.

The 1947 lost sales of paper and soda pulp amounted to only .54% of what dollar sales would otherwise have been in that year and the 1948 loss to 1.31% of what that year's total would have been. In terms of physical units, the lost paper production was about .55% in 1947 and .88% in 1948; the soda pulp not available for sale was approximately .27% in the former year and 2.88% in the second. Corresponding losses in pretax profits on the two products combined were but .47% for 1947 and 1.82% for 1948.

Oxford maintains, however, that to look only at the loss in physical volume would be to adopt too much of a keyhole view. A taxpayer's "normal production, output, or operation" may be "interrupted," asserts Oxford, if a qualifying abnormality causes him temporarily to change his production process, at greatly increased costs, in order to maintain his unit output as high as he can, just as much as if he elected to cease altogether. In one case under § 722(b) (1), the Commissioner conceded that temporarily increased labor costs could be taken into account when they were caused by a qualifying event—there a strike—although the abnormality had had no effect on the volume of production, Schneider's Modern Bakery, Inc., 19 T.C. 763, 772 (1953). Compare Triangle Raincoat Co., 19 T.C. 548, 561–563 (1952). However, the Commissioner seems to have repented of this concession; moreover, he argues that, whatever might have been the case with the World War II statute, under the Korean Act unusual events that merely increase costs and thereby reduce profits do not qualify a taxpayer for relief. The Tax Court's opinion in Fulton Foundry & Machinery Co., 26 T.C. 953, 956–957 (1956), aff'd per curiam, 249 F.2d 445

(6 Cir. 1957), contains statements to that effect, although it does not appear that the taxpayer in that case made the detailed showing of causal relation between the unusual event and the increased costs that was here presented, and decision could well have been rested on that ground. See also D. L. Auld Co., 17 T.C. 1199, 1205 (1952) (dictum in case construing § 722(b) (1)).

■ We disagree with the Commissioner. The object of the various excess profits tax relief provisions under both statutes is to ensure that the finally derived average base period net income should reflect what the taxpayer would have earned in the excess profits tax year but for the war which fortuitously increased his profits, and that, to that end, the actual income for base period years which were not representative for a reason defined in the statute should be replaced by a constructive income. See H. R.Rep.No.3142, supra, pp. 3–4 (1951–1 Cum.Bull. at pp. 188–189); S.Rep.No. 2679, supra, pp. 3–4 (1951–1 Cum.Bull. at pp. 241–242); Tarleau, supra, 50 Mich.L.Rev. at 365–366 (1952). The change in the Korean Act whereby constructive income for years eligible for relief was to be computed on an industry average rather than on an individually reconstructed basis—a change which, although it would affect some taxpayers favorably and others unfavorably, ought produce approximately the same overall results for the Government—does not warrant a reading of § 442(a) (1) that would give relief to a taxpayer who subsided under "the slings and arrows of outrageous fortune" but would deny it to a more enterprising concern that kept up its output by altering the method of production and incurred unusual costs in doing so. True, the Korean statute did not permit the latter taxpayer to reconstruct his income for the eligible years by showing exactly what his individual profits would otherwise have been; for better or for worse, he must take the industry average. But that does not mean that he may not rely on increased costs as well as diminished volume to show that the unusual or peculiar event had a significant effect in interrupting normal production or operation; "normal" relates to the method as well as to the end result.

■ Certainly, to take an extreme case, if Oxford had maintained full production by recruiting hordes of workers who would turn the machines manually— assuming that were possible, it would be hard to deny that "normal production * * * or operation" had been interrupted. Again, Congress could not have meant to penalize a taxpayer whose diligence led him to produce, at vastly increased expense, in barns or tents when his well-equipped factory burned down, as against one who simply went out of business until he rebuilt. We do not say that any increase in costs occasioned by "events unusual and peculiar in the experience of the taxpayer" constitutes the interruption or diminution in "normal production, output, or operation" on which § 442(a) (1) conditions relief. We do say that when such events require what had been a self-contained, integrated, hydroelectric and hydromechanical operation to resort to the manufacture of electrical energy by other means, the purchase of materials in large quantities, and other radical changes in operation, in order to mitigate the diminution in physical volume, a determination whether "normal production, operation, or output" has been significantly "interrupted" must take account of these efforts as well as of the physical volume. In thus taking account of Oxford's increased costs as well as its lost sales we are not making an exact determination of the extent to which Oxford's profit position was changed, as would have had to be done in determining constructive income under the World War II Act; we use them only to help determine whether Oxford made a showing of interruption in the normal productive process from an admittedly qualifying event, which was "significant and not trivial."

■ As stated, the total increase in out-of-pocket costs proved by Oxford was

about $313,400. Adding the $75,700 loss in profits attributable to the decline in sales, a total loss of $389,100 appears to have been suffered, $108,200 in 1947 and $280,900 in 1948. Comparing these figures with what Oxford's net profits before taxes would have been if the losses had not occurred, the loss for 1947 amounted to some 2.3% of pre-tax profits, that for 1948 amounted to 8.8%, and the loss for the two years was 5% of what total pre-tax profits would have been but for the drought.

These figures are convincing that Oxford met the statutory test for 1948, when the equivalent of approximately a month's expected profits was lost. Indeed, if the two years could be considered together, this conclusion might be reached for both. However, we agree with the Commissioner that the statute forbids such an approach; each year must stand on its own bottom. Because of its agreement with the Commissioner that the excess of Oxford's sales in 1947 over 1946 automatically prevented 1947 from qualifying, the Tax Court did not reach his claim that denial of eligibility was required on other grounds. Although we could remand for further consideration by the Tax Court, § 7482(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482(a) authorizes us to review its decisions "in the same manner and to the same extent as decisions of the district court in civil actions tried without a jury"; application of the statute and the "significant and not trivial" requirement of the Regulations to unquestioned facts is thus a function we can appropriately perform. Looking at 1947 alone, we do not believe the exceedingly small curtailment of volume and the relatively inconsequential cost impact of the changed methods of production constituted the significant interruption or diminution in normal production, output or operation required to entitle Oxford to the large benefits which reconstruction of its income for that year would bring. If our different treatment of the two years be said to turn on a difference in degree, as it surely does, it stands none the worse on that score, LeRoy Fibre Co. v. Chicago, Milwaukee & St. Paul Ry. Co., 232 U.S. 340, 354, 34 S.Ct. 415, 58 L.Ed. 631 (1914).

We hold that Oxford is entitled to excess profits tax relief under § 442(a)(1) for 1948 but not for 1947; accordingly the reconstruction will be under § 442(c) rather than § 442(d), which Oxford used. We therefore reverse and remand to the Tax Court for redetermination of the deficiency in accordance with this opinion.