**NEW YORK SHIPBUILDING CORPORATION, a New York corporation, in its own right, and as Successor in Merger to Nesco, Inc., a New Jersey corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 115–61.**

United States District Court
D. New Jersey.

Feb. 2, 1965.

As Amended Feb. 11, 1965.

Starr, Summerill & Davis, by William C. Davis, Camden, N. J., and Mark Hulsey, Jr., and Joseph M. Glickstein, Jacksonville, Fla., for plaintiff.

David M. Satz, Jr., U. S. Atty., D. New Jersey, by Lee B. Laskin, Asst. U. S. Atty., Camden, N. J., and Louis F. Oberdorfer, Asst. Atty. Gen., by Thoms F. Field, Atty., Dept. of Justice, and C. Moxley Featherston, and Rufus E. Stetson, Jr., Attys., Department of Justice, Washington, D. C., for defendant.

COHEN, District Judge:

Plaintiff, New York Shipbuilding Corporation, a New York corporation, in its own right and as successor by merger to Nesco, Inc., a New Jersey corporation (hereinafter Nesco), seeks refund of federal excess profits taxes for the tax years 1950, 1951, 1952 and 1953, paid to defendant, United States of America, amounting to $51,779.13, plus statutory interest.[1] The corporate merger of Nesco into plaintiff was effected April 23, 1954. The taxes in dispute were paid by plaintiff, New York Shipbuilding Corporation, as a result of an audit of the income and excess profits tax returns of Nesco for the years 1950–1953 inclusive. All other conditions precedent under the Internal Revenue Code, 1939, § 442, have been met. Jurisdiction is conferred by 28 U.S.C. § 1346(a) (1). Narrative herein is derived from stipulations, exhibits, depositions and oral testimony.

The issue is whether the taxpayer is entitled to the tax relief sought under the provisions of section 442(a) (1) of the Internal Revenue Code of 1939, enlarged by the Excess Profits Act of 1950, 64 Stat. 1137, 1163 (1951), 26 U.S.C.

---

1. Stip. paras. 1–5 and 12.

Excess Profits Taxes, § 442(a) (1).[2] It is the opinion of this Court that the taxpayer has met the burden of proof requisite for tax relief entitlement.

Nesco was founded in 1899 as a result of a consolidation of four separate tinware and enamelware companies located in Milwaukee, Wisconsin; Baltimore, Maryland; Granite City, Illinois, and Laurel Hill, New York. During 1900 to 1935, it added new product lines to its basic tinware and enamelware business, and in the 1930's, in addition to its four original plants, it added sites in St. Louis, Missouri, and New Orleans, Louisiana; warehouses in Chicago, Illinois, and Philadelphia, Pennsylvania; and a steel foundry at Granite City, Illinois. During the Great Depression, the operations in St. Louis and New Orleans were abandoned, the Chicago and Philadelphia warehouses sold, and the steel foundry at Granite City became an independent corporation.

In 1941–42, Nesco built a new factory at Jacksonville, Illinois, about 85 miles from its existing plant in Granite City, Illinois. The new plant, now being Nesco's fifth, was built as a defense products facility, with conversion into an electric appliance plant contemplated at the eventual termination of World War II.

The principal products of Nesco may be termed housewares, i. e. fabricated metal products, such as bread boxes, coal buckets, pie plates, tinware, scrub buckets, funnels, kerosene stoves and heaters, cooking pots, stainless steel cooking utensils, electric roasters, broilers and casseroles, and additionally, milk cans, and steel shipping drums of various types. Because Nesco's primary production was not that of electrical products in the sense of industrial classification, it used the classified industrial rate of return of 15.4% for the fabricated metal products industry in its tax computations, rather than the lower rate of 14.5% return fixed for the electrical equipment industry. The government finds no fault with this choice of classification and rate by the taxpayer, conceding that the bulk of Nesco's production during the base experience years of 1946 through 1949 consisted of fabricated metal products.

With the end of World War II, removal of wartime defense production at Jacksonville, Illinois commenced with retooling and plant process conversion to mercantile production of electric roasters, casseroles, and broilers. Civilian production commenced in earnest in 1946. The post-war period from 1946 through 1949 provided a heavy consumer demand, and Nesco equated production of its electrical housewares with shipment on an allocation basis, without accumulating inventories of finished products.

During 1947, just as Nesco's Jacksonville plant geared itself to full capacity production for delivery of finished products to dealers for seasonal purchasing peaks, preceding Thanksgiving and Christmas consumer demands, the unionized employees at Nesco's Jacksonville plant struck. This strike commenced with the afternoon labor-shift August 8, 1947, and continued without abatement through October 17, 1947. Picket lines were established around the plant, and the resultant work stoppage was complete.

It is the contention of plaintiff that, as a consequence of this strike, its normal

2. 26 U.S.C. § 442. "Average base period net income—abnormalities during base period.
  "(a) In general. If a taxpayer which commenced business on or before the first day of its base period establishes that, for any taxable year within, or beginning or ending within, its base period:
  "(1) normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during such taxable year, of events unusual and peculiar in the experience of such taxpayer * * *
  "the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable."

production was substantially interrupted by an event which was unusual and peculiar in its experience, and that, as a result thereof, it sustained a gross sales loss of approximately $800,000.00, and an estimated profit loss of $124,928.00. Plaintiff supports these figures in the record.[3] Additionally, unproductive plant expenses during the strike were not less than $62,590.00.[4] Hence, the computed combined loss of $187,518.00 represented 10.2% of the overall profit which would have been realized by Nesco, but for the fortuitous eventuality of the strike in question. Plaintiff submits that under section 442(a) Excess Profits Act, these facts qualify it for tax relief, entitling it to reconstruct its excess profits net income under the automatic provisions of section 442(c) of the Act during its base period. Plaintiff further maintains that such reconstructed base period net income would have been larger than that otherwise determined, but for the strike in question; and the result thereof would be to increase its excess profits credit, decrease its income subject to excess profits taxes in the years 1950, 1951, 1952 and 1953, and result in the refund sought, plus statutory interest.

Defendant does not dispute plaintiff's classification of its industry as one of fabricated metal products, nor its use of the reconstruction of income formula provided by the statute. Defendant's point of departure is principally on the question of taxpayer "eligibility." It contends that what constitutes "normal production, output or operation" for this, as well as any particular taxpayer, is that established by the actual production experience up to the time of the alleged qualifying event, and it supports its position by reference to Treasury Reg. 130, sec. 40.442(a) (1), as being a contemporaneous construction of the Congressional enactment. Defendant

urges that "Neither Congress nor the Commissioner have indulged in subjective speculations about 'what might have been' but for the Korean War or but for an interruption to production." [5] The defendant insists that the standard called for is an objective one, based solely on past performance; and that the subjective standard of normalcy urged by plaintiff is that which was sought to be eliminated by the Korean War Excess Profits Tax Act,[6] making the taxpayer's realistic experience the base rather than speculative reconstruction.

■ Such, then, are the respective positions of the parties, and briefly stated, also, their approaches to the tax law. The problem is not without complexity, as most tax matters seem destined. However, much aid is afforded by the opinion of the Court of Appeals for the Second Circuit in the case of Oxford Paper Co. v. C. I. R., 33 T.C. 943, reversed, 302 F.2d 674 (2 Cir. 1962). As stated by Judge Friendly, at page 678:

"To us 'normal' means what would have occurred but for the 'unusual and peculiar events' that produced the deviation from the norm. Indeed, the Commissioner himself properly recognized this in his regulations under the similar language of § 722(b) (1) of the World War II Act, Regulations 112, § 35.722–3 (a):

" 'Normal production, output, or operation means the level of production, output, or operation which would have been reached by the business of the taxpayer had the unusual and peculiar events not occurred.' "

■ In Oxford, the event sought to be qualified as one unusual and peculiar in the experience of the taxpayer was a drought which cut off the power-supply of a Maine Paper Manufacturing Company. There had been other droughts, but none so severe. In the instant case,

3. Supp. Stip. par. 19, Table 5, 1946–7–8; Exs. P–9, 10 and 11.

4. Exs. P–9, 10, 11 and 12; Ex. P–4 p. 2.

5. Dft's Br. p. 41.

6. 26 U.S.C. sec. 442(a) (1). See note 1, supra.

there was a strike, the labor force being completely withdrawn from the Jacksonville plant of the taxpayer. In Oxford, the profits of the drought year were higher than prior years, but less than they would have been but for the drought. A similar situation prevails here. Nesco's profits in 1947, although higher than in 1946, its first year of peacetime production, were less than they would have been, but for the strike in question. Thus, there was in fact, an interruption of production of Nesco, although the defendant insists such was not a qualifying event under the Act as augmented by Treasury Reg. 130, § 40.-442, it not being an event unusual and peculiar in the experience of the taxpayer. The effort of defendant, by a strained construction of the Treasury Regulation, to preclude consideration of *what would have been* production, output, or operation, *but for the event* alleged as the eligibility factor for tax relief, cannot prevail. True, such a regulation is entitled to great weight as an interpretative aid of source legislation, Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695 (1948), but administrative amplification must not conflict with the philosophy and avowed purpose of legislation. As stated in Oxford, supra, 302 F.2d p. 679:

"Hence, if the reference in Regulation 130, § 40.442-2(a) (1), to 'the actual experience of the taxpayer up to the time of unusual and peculiar event occurred' would prevent consideration of increased capacity that would have been used but for the 'unusual and peculiar event,' we should be obliged to consider it invalid."

The Laurel Hill, New York; Baltimore, Maryland; Milwaukee, Wisconsin, and Granite City, Illinois, plants of Nesco had been organized by labor unions in the late 1930's. The new Jacksonville plant had been union organized in wartime, shortly after its defense production operations in 1942. Defendant's brief reviews exhaustively the labor history of all of Nesco's plants, and may be summarized as follows:

*Labor Disputes at Nesco's Plants:*

1. Laurel Hill, New York: Two work stoppages, involving employee grievances, small groups, not entire plant. National Steel Strike of 1946, approximately 4 months.

2. Baltimore, Maryland: One organizational strike in 1938. One "wildcat" strike in 1944 of less than a week. Some 36 work stoppages involving employee small group grievances varying in duration from 1 hour to a day or two, not entire plant.

3. Milwaukee, Wisconsin: Between the years 1938 and 1951, only one lockout 1938, and one brief work-stoppage, not entire plant.

4. Granite City, Illinois: Approximately 72 work-stoppages, involving employee grievances of small groups, not entire plant. National Steel Strike 1946, approximately 4 months.

5. Jacksonville, Illinois: National Steel Strike 1946, approximately 4 months, during plant conversion from defense to peacetime production. At least 2 work-stoppages, small group grievances, not entire plant. One threatened strike in Spring of 1947 during labor contract renewal negotiations. When these negotiations failed, the strike of Aug.–Oct. 1947, ensued, being of 71 days' duration.

The crucial strike of 1947 at the Jacksonville plant was characterized by the union as a "lockout", because contract-renewal negotiations had failed, assertedly due to the fault of management; and as a "strike" from the viewpoint of Nesco, because the labor force was withdrawn and picket lines set up terminating its production for the entire period. Defendant contends Nesco's labor experience picture, especially that of 1946, defeats the application of section 442, because, by reason thereof, the 1947 strike at Jacksonville was not an event "un-

usual or peculiar" in the experience of the taxpayer. Further, that any interruption of production was minimal, Nesco having transferred certain production to other plants during the strike; and that its profit picture for 1947, having been superior to both 1946 and 1949, and only slightly behind 1948, demonstrates that the effect upon Nesco as a taxpayer was trivial and not warranting excess profits tax relief. Defendant's further argument that Nesco provoked the strike in question in order to build inventories and cut labor costs is too speculative to warrant consideration. The relative bargaining merits in regard to the strike are not an issue here. It is undisputed that the physical event of a full scale strike of substantial duration in time did occur. It is the effect with which we are concerned.

Despite characterization by the parties of the strike as a "work stoppage", "lockout", or "strike", production did in fact come to a complete halt with the withdrawal of the entire union labor force. Labor and management were literally in a state of economic war, for such is a strike. With the picketing during the months of August, September and part of October, 1947, no materials went into or out of the plant, except a piece of machinery which had been smuggled across the picket line. The Nesco plant was actually in a state of seige. As stated in Burford-Toothaker Tractor Co. v. United States, 262 F.2d 891, at p. 892 (5 Cir. 1959):

> "There is, and can be, no dispute that under the statute,[1] the regulations,[2] and analogous decisions[3] under a predecessor Act[4] a strike in a major supplier's factory is an event 'unusual and peculiar in the experience of such taxpayer'."

"1. Section 442(a) provides:

> "If a taxpayer * * * establishes that, for any taxable year within * * * its base period: (1) normal production, output or operation was interrupted or diminished because of the occurrence

* * * of events unusual and peculiar in the experience of such taxpayer, * * * the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable." Int.Rev.Code of 1939, Sec. 442(a), 26 U.S.C.A., Excess Profits Taxes Sec. 442(a).

"2. Regulation 40.442–2(a) provides·:

> "(2) Not every interruption or diminution of normal production, output, or operation in the base period may furnish the basis for the application of Sec. 442(a) (1). The interruption or diminution must be significant and not trivial."

> "(3) * * * Unusual and peculiar events contemplated in Section 442(a) (1) consist primarily of physical rather than economic events or circumstances. Such physical events include floods, fires, explosions, *strikes*, and other exceptional and uncommon circumstances hindering production, output, or operation." (Emphasis supplied.) U. S. Treas. Reg. 130, § 40.442–2(a) (2) and (3) (1951).

"3. United Motor Coach Co. v. Commissioner, 22 T.C 578, 580; Pelton & Crane Co. v. Commissioner, 20 T.C. 967, 974; Schneider's Modern Bakery, Inc. v. Commissioner, 19 T.C. 763, 772; Triangle Raincoat Co. v. Commissioner, 19 T.C. 548, 560.

"4. See Section 722 of the World War II Excess Profits Tax, added by Section 201, Second Revenue Act of 1940, c. 757, 44 Stat. 974, and amended by Section 222(a), Revenue Act of 1942, c. 619, 56 Stat. 798. While the basic approach of Section 722 was to test the impact of the event on probable *earnings*, and not, as in Section 442, note 1, supra, simply on the more tangible matter of pro-

duction or operations, see S.Rep. No. 2679, 81st Cong., 2d Sess. 17–18 (1950), the event under both Acts was described as 'events unusual and peculiar in the experience of such taxpayer * * *.' "

In the foregoing case, output of the taxpayer was curtailed through failure of its major supplier to make deliveries of equipment to it, caused by a strike in the supplier's plant. In the instant case, cessation of production of the taxpayer was caused directly by a strike in its own plant.

The labor history of Nesco over many years, even during a time when unionism was having "growing pains," was sporadic, short in duration and of minimal impact on its production, with the sole exception of the National Steel Strike of 1946, which affected principally the plants at Laurel Hill, New York, and Granite City, Illinois. The National Steel Strike was not such as could be confined to the labor experience of this particular taxpayer. It was an event affecting the basic economy of the entire nation. The 1938 organizational strike at Baltimore, Maryland, was less than a month; the 1944 Baltimore strike less than a week; there were "wildcat" and brief work stoppages of small groups, during and after World War II, primarily at Granite City, Illinois, but never involving an entire plant. In over 20 years of a 5-plant operation, such was a mild labor picture as distinguished from a chronic labor-management struggle. The 1947 Jacksonville strike was not such as to warrant its classification as usual or characteristic, as distinguished from unusual and peculiar. Nor was the 1946 National Steel Strike characteristic or a precursor of labor trouble peculiar to the taxpayer. It might be considered with more justification, an unusual event in the experience of the taxpayer, an isolated and peculiar experience factor, although common to all taxpayers of the nation whose industries were affected by the basic steel industry. The statutory tax relief provisions refer to base period events, which were unusual and peculiar in the taxpayer's experience. The 1946 strike was a National Steel Strike during Jacksonville's plant conversion; whereas, in the very next year in the base period, the strike was an isolated plant strike of the taxpayer, clearly unusual and peculiar in its experience. It is notable, that both strikes at the Jacksonville plant were within its base period experience. Compare the distinction between *events* prior to and during base period experience under the World War II and Korean Acts, in Oxford, supra, 302 F.2d at page 678.

That the 1947 strike brought about a substantial nontrivial interruption or diminution in normal production, output or operation, reflected by substantial impairment of the taxpayer's earnings picture, seems clear from the record. It has been established by stipulations and depositions that in 1947, only the Jacksonville plant of Nesco produced electric roasters, broilers, and casseroles, and that none of its production was or could have been transferred to its other plants, which were not equipped for these purposes. The most that was done, was the enameling of some preassembly parts which made possible the acceleration of Jacksonville production after the strike, rather than having it lose additional time firing enameling equipment over an approximate 3-week period. The fact that Nesco's other plants were physically unaffected by the Jacksonville shutdown has no bearing on the taxpayer's right to relief, if the loss to Nesco in Jacksonville's production was significant and not trivial. Of the five plants, Jacksonville, though the newest, was second in gross sales; and in a demanding postwar market, it manufactured the most lucrative items, profitwise, of any of Nesco's plants. Its percentage of loss factor was higher than that in Oxford. The fact that 1947 was the second best profit year of the taxpayer's base period (1946 was discounted under the Act, as being the lowest profit year of the base period), is of no consequence. If it would have been substantially better, but for the interruption in production during a pre-

seasonal peak-sales period which it experienced, then such earning potential is vitally material. The record discloses a gross production loss of $800,000.00, with an estimated profit loss of $124,928.00, and unproductive plant expenses of $62,590.00. Combined the latter two figures make a computed loss of $187,518.00. Percentagewise, this represents a 10.2% loss of what Nesco's profit factor would have been but for the strike, a considerably significant and substantial factor under most any business circumstances. There was no proof, other than conjecture, of materiel shortage which would have occasioned such a production loss. There was testimony that, while steel supply was still on an allocation basis in 1947, Nesco's prior ownership and continued friendly liaison between it and the management of the steel foundry situated at Granite City, Illinois, placed it in a favored position for steel acquisition. Additionally, it had assurance of steel supply from its usual suppliers, so that steel stock from Nesco's sources was well within its current production needs for the period of strike. This is borne out by Nesco's full production both before and after the strike of 1947.

In Oxford, the qualifying event was a drought. The argument was made there, as here, that the profit loss was trivial, as the taxpayer had had a good profit year, despite the drought, as well as a year more profitable than some of its other base period years. The Court pointed out that triviality refers to interruption of production or operation, and that cost and profit margins are used to gauge the extent and significance of such interruption, stating at p. 681:

"In thus taking account of Oxford's increased costs as well as its lost sales we are not making an exact determination of the extent to which

Oxford's profit position was changed, as would have had to be done in determining constructive income under the World War II Act; we use them only to help determine whether Oxford made a showing of interruption in the normal productive process from an admittedly qualifying event, which was 'significant and not trivial'."

Aside from the factor of increased costs of operation because of the drought in Oxford, the Court concluded that the taxpayer's pretax profit loss for 1948, one of its base period years, was 8.8% less than it would have been but for the drought. In the instant case, because of the 1947 strike in Nesco's base period, its pretax loss of profits was 10.2%. The demonstration, accountingwise, of lost profits is not pertinent in ascertaining the amount of excess profits tax relief which may be warranted; such is arrived at on the basis of industry average. The causal pertinency goes to the question of eligibility, and the criterion of significant rather than trivial interruption of production, output or operation.[7] Oxford, supra. Defendant challenges plaintiff's computations of increased costs and loss of profits, but offers no contrasting proof.[8] Of like complexion is the question of steel shortage in 1947 raised by the defendant without any factual foundation. The record does disclose, however, that critical national distribution of steel did not prevent Nesco's Jacksonville plant from increasing its steel inventories, $168,573.28 at April 30, 1947 and $183,298.27 (i. e. $61,208.41 + $122,089.86) at July 31, 1947,[9] which inventories were maintained at a three-months' supply. The conclusive proof of steel availability is Jacksonville's output of electrical appliances in May, 1947 of $316,172.00 and in July,

---

7. Exhibits P–8, 9 and 10.

8. In support of its characterization of *de minimus* interruption of Nesco's production by the 1947 Strike, defendant relies upon the first line of stipulated exhibits B, C, D & E of electrical equip-

ment sales, as related percentagewise to combined plant gross sales: 1946–11.7%; 1947–19.8%; 1948–27.3% and 1949–21.2%.

9. Ex. P–3, Classes 241 and 251.

1947 of $271,131.00.[10] The strike months crippled the Jacksonville plant at its pre-season production peak of Thanksgiving and Christmas when, but for the strike, it would have been increased and immediately consumed in a waiting and demanding market. Sales in the heavy consumer Eastern Section of the United States in the Fall of 1947 were lost to competitors without recoupment. Post-season products from resumed operations were directed to the West and Midwest.

There seems little doubt that factually, plaintiff has made out a case entitling it to tax relief. As stated in Oxford, at p. 681:

"The object of the various excess profits tax relief provisions under both statutes (World War II Act, and Korean Act) is to ensure that the finally derived average base period net income should reflect what the taxpayer would have earned in the excess profits tax year but for the war which fortuitously increased his profits, and that, to that end, the actual income for base period years which were not representative for a reason defined in the statute should be replaced by a constructive income." (Citations omitted; parenthesis supplied.)

It is quite clear that the tax laws generated by World War II, and the Korean Action, as well as the regulations promulgated thereafter, sought to establish standards and formulae for the determination of corporate excess profits tax relief that were not without problems of application. Indeed, this was recognized in 1951, when the Senate Finance Committee in seeking to establish an amendment to section 442 by adding sub-section (h) which was to be an "automatic" formula, stated:

"[These existing provisions] frequently may involve extremely diffi-

cult evidentiary problems, particularly with respect to a determination of the extent that any single event has affected the taxpayer's normal production, output or operation." (Portion in brackets supplied.) [11]

The analytic grasp of these somewhat complex tax concepts is reflected in the opinion of Judge Friendly in Oxford. There, the essential purpose of the particular tax relief legislation under consideration is elucidated, and guide-lines indicated with such compelling simplicity of statement, as to render unnecessary this Court's undue preoccupation with ascertainment of Congressional intention. The legislative objective was to provide tax relief to a taxpayer upon the happening of a qualifying condition for eligibility, and to prescribe precise formulae for the determination of specific tax relief. That such formulae presents problems in methodology is not a phenomenon in tax legislation. This is so, whether a particular formula be arithmetically automatic, as was sought to be accomplished in 1951 by section 442(h), or objective on base period experience, as well as subjective with respect to what might have been—but for the peculiar event prerequisite to eligibility. That Congress intended only a demonstratively objective past performance standard of measure, as contended by the defendant, is an illusion. That subjective considerations may be invoked in applying qualifying formulae for tax relief does no violence to objective legislation of Congress. The application of an equation between what production, output or operation would have been, but for a certain event, is merely making use of projections in accepted business practice, and is a familiar, necessary and valuable accounting and marketing technique. As succinctly

10. Supp. Stip. p. 6, Table 5.

11. Revenue Act of 1951, Report of Senate Finance Committee No. 781, 82nd Cong. 1st Sess., Calendar No. 737 par. 5 pp. 76–77, U.S.Code Congressional and

Administrative Service, p. 2050. See also: Excess Profits Tax Act of 1950, Report of Senate Finance Committee, No. 2679, 81st Cong. 2nd Sess., Calendar No. 2676 pp. 17–21.

stated in Burford-Toothaker, supra, 262 F.2d at page 893:

"Congress did not mean to write into this objective formula (442(a) (1)) any legal casuistry. It was dealing with the very practical matter of taxes in practical day-to-day business operations. The test was simply: did the exceptional event cause a substantial non-trivial interruption or diminution in every day operations? That, in turn, was to be determined in a practical way on practical business probabilities. In this light, with no explanation other than the strike for the sudden and complete cessation of deliveries, followed by normal resumption in the succeeding months, it is artificial to reason on rigid notions of proximate cause that the strike did not, in law, bring this about * * *" (Parenthesis supplied.)

Such business probabilities are but analogues of cost-accounting. Without a realistic harmonizing of these objective and subjective economic concepts, business could not long survive. The collective experience of the Senate Finance Committee in the exercise of its business acumen in designing the legislation in question, as well as of Congress in its legislative wisdom, displays an awareness of these economic factors, as distinguished from metaphysical contemplation, in providing excess profit tax relief to a particular taxpayer under given economic circumstances. Purpose, method and application of tax legislation should not be confused. Legislative panacea was not intended, for it may be presumed that Congress was aware, as is the judiciary always, that the application of legislation to particular cases presents particular problems of construction. That was the approach of the Court in Oxford, and such is the view of the Court here.

In conclusion, it is the finding of this Court that plaintiff has sustained the burden of proof incumbent upon it to show entitlement to tax relief for the periods in question under sec. 442(a) (1) Excess Profits Tax Act, supra.

The foregoing shall constitute findings of fact and conclusions of law.

Plaintiff may submit an appropriate order with actuarial figures, either upon notice or by consent.