**UNITED STATES STEEL CORPORATION, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 65 Civ. 3043.**

United States District Court
S. D. New York.

Oct. 2, 1969.

White & Case, New York City, for plaintiff; Haliburton Fales, 2d, A. Chauncey Newlin, Edmund W. Pavenstedt, Rayner M. Hamilton, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., Southern District of New York, for defendant; Laurence Vogel, Special Asst. U. S. Atty., Alan B. Morrison, Asst. U. S. Atty., of counsel.

## OPINION and ORDER

LEVET, District Judge.

The plaintiff has moved for reargument of the court's decisions stated in opinions dated July 1, 1969, 305 F.Supp. 497; 305 F.Supp. 508.

### I.

Plaintiff maintains that the three basic conditions alleged in its complaint, namely (1) "low quality of coking coal and iron ore, resulting in loss of production;" (2) "abnormal cost-price relationships, resulting in the depression of Plaintiff's business and earnings;" and (3) "numerous and protracted strikes, resulting in the interruption and diminution of Plaintiff's normal production, output and operation;" (Complaint, September 30, 1965, p. 3) "interact with one another so that, even if, contrary to plaintiff's firm insistence it should be concluded that no one claim in and of itself constituted, within the meaning of the statute, temporary economic circumstances unusual in the case of the taxpayer or events unusual and peculiar in the experience of the taxpayer, when all three claims are taken together there did occur such circumstances and events, and that plaintiff is entitled to aggregate those abnormalities to this end." (Plaintiff's memorandum, August 8, 1969, p. 8)

Apparently, the argument is as follows: Each of the three claims in and of itself should constitute a qualifying abnormality. However, even if the three claims do not qualify separately, the plaintiff should be entitled to aggregate them and submit them in combination so as to constitute one qualifying abnormality.

In support of this theory, plaintiff cites a paragraph from the Treasury Department Bulletin on Section 722 (November, 1944) which raises the possibility that "(a)n unusual combination or concurrence of usual conditions may of itself constitute an unusual event or condition under section 722(b) (2). For instance, a taxpayer's business may have been depressed during the base period because of an unusual combination of temporary economic circumstances, no one of which was unusual or would have abnormally depressed the business if existing alone." Treasury Department Bulletin on Section 722, Part III(B), cited in Standard Excess Profits Tax Reporter, volume 3A (1946), at ¶ 5145.-12.

Plaintiff cites no decision where any court has either endorsed this general suggestion or discussed it; nor is this court aware of any. Indeed, the foreword to the Bulletin contains the comment that any provision therein "does not have the force or effect of a published ruling or of a Treasury decision." Id. at ¶ 5145.

Obviously, the Bulletin does not have the force of a judicial determination.

Even if a court did favor the general idea presented, it could not, in the absence of any guidelines, determine when a combination of separate non-qualifying conditions would constitute a qualifying abnormality and when such a combination would not. The Bulletin's hypothetical suggestion, therefore, not only lacks any authoritative imprimatur (as indicated by the absence of even a scintilla of legislative or judicial support since the idea was advocated originally in 1944), but also lacks even a semblance of practicability.

### II.

Plaintiff maintains that the three conditions alleged in its complaint as qualifying abnormalities should not be adjudicated separately because they are "related by their application to plaintiff's production and the depression of plaintiff's business, and related by time and space." (Plaintiff's memorandum, September 22, 1969, p. 3)

However, separable issues (for purposes of interlocutory adjudication) may be presented in a tax refund action for a given year, even if only one "claim for relief" is said to be filed for each

taxable year (for purposes of appealability under F.R.Civ.P. 54(b)).

It should be pointed out that final judgment in this case (in contrast to any interlocutory adjudication of separable issues which may constitute portions of a "claim for relief") must await judicial determination of all such issues. The parties agree that the third condition propounded as a basis for relief under 442(a), involving "numerous and protracted strikes, resulting in the interruption and diminution of Plaintiff's normal production, output and operation," must be litigated at a forthcoming trial.

■ In determining whether separately adjudicable issues are present, a court analyzes the set of operative material facts specifically asserted as the underlying basis for each allegation of a qualifying abnormality. Each separate condition must stand on its own as the first element required for relief is considered, i. e., whether a taxpayer has established a qualifying cause for any diminution of its production or depression of its earnings during the base period years. Establishment of one or more qualifying causes is a prerequisite to further consideration under 442 as to the amount of quantitative relief to which a taxpayer may be entitled for each year in question. If more than one qualifying cause is determined to exist, the effects of the separately-established causes may then be aggregated for quantitative considerations.

After the defendant had moved for summary judgment as to the issues in plaintiff's complaint dealing with "low quality of coking coal and iron ore, resulting in loss of production" (Motion #2, 305 F.Supp. 497) and "abnormal cost-price relationships, resulting in the depression of Plaintiff's business and earnings," (Motion #3, 305 F.Supp. 508) both parties submitted statements pursuant to General Rule 9(g) of the Southern District of New York.

In order to pinpoint the issues and "pierce the pleadings and * * * assess the proof in order to see whether there is a genuine need for trial," (Dressler v. MV Sandpiper, 331 F.2d 130, 132 (2nd Cir. 1964)) the court requested the parties to prepare Joint 9(g) Statements delineating the facts which were not genuinely disputed for the purposes of the two motions, as well as separate statements setting forth any specific facts alleged to be in genuine dispute.

Subsequently, the parties submitted joint statements for Motion #2 (110 paragraphs) and Motion #3 (45 paragraphs). See the sections in the court's opinions on The Propriety of Summary Judgment.

The three basic conditions alleged as qualifying abnormalities are mentioned together in both joint statements in identical paragraphs, which read in pertinent part as follows:

"The occurrences depressing plaintiff's business and diminishing its production in 1947 and 1948 * * * included the imbalance between the inherent characteristics of constituent materials for blast furnace burdens as mined and the beneficiating facilities to adjust and transform such characteristics, strikes and an unusual labor relations situation, and an abnormally narrow cost-price gap, *each of which reacted on the other in contributing to the overall depression of plaintiff's business.*" (Emphasis added)

Joint 9(g) Statement on Motion #2, ¶ 21;

Joint 9(g) Statement on Motion #3, ¶ 19.

These paragraphs state that each of the three conditions contributed *quantitatively* to "the overall depression of plaintiff's business" during 1947 and 1948. However, the motions for summary judgment before the court dealt with the legal sufficiency on a *qualitative* basis of two of the three basic conditions put forth by plaintiff as qualifying abnormalities under § 442(a).

■ As discussed above, separate qualitative conditions may only be aggre-

gated to determine their quantitative effect for each base period year after one or more of those separate conditions has been determined to constitute a qualifying abnormality.

It is one thing to say that each of the three basic conditions contributed quantitatively to a depression of plaintiff's business; it is quite another to say that each of the three conditions may not be considered separately in determining the existence of qualifying abnormalities.

The joint statement for Motion #2 contains no further reference to strikes. The joint statement for Motion #3 refers to certain strikes as a prelude to wage settlements which increased plaintiff's costs. Insofar as wage settlements after strikes contributed to increased costs, such settlements are not a basis for relief under 442(a). See the court's opinion on Motion #3.

No material operative fact contained in either of the joint statements deals with plaintiff's third condition—strikes as a cause of diminished production. The notion that each of the conditions existed at some time during the base period years does not overcome the principle that separate conditions based on separate sets of operative facts may be adjudicated separately to determine the existence of a qualifying abnormality.

After studying the factual record before the court on both motions, I conclude that each of the three basic conditions alleged in paragraph 11 of plaintiff's complaint may be adjudicated separately.

### III.

Referring to Motion #2, plaintiff maintains that it should have further opportunity to come forward with some additional external cause for its delay in development of beneficiating facilities which is not directly attributable to World War II or to reasonably-expected competitive pressures. (Plaintiff's memorandum, September 3, 1969, pp. 2–5)

However, plaintiff admitted for purposes of Motion #2 that:

"During the period 1941 to 1948, inclusive, because of such factors as war-induced shortages of men and materials, particularly engineers and draftsmen, steel, steel fabricated products, electrical equipment and delays by suppliers and subcontractors, plaintiff was unable to maintain normal development and expansion of beneficiating facilities." Joint 9(g) Statement for Motion #2, ¶ 16.

As a matter of law, a taxpayer seeking relief under 442(a) must allege causative factors which are external to it, because the statute was not designed to counteract errors of business judgment or to underwrite unwise business policies. Granite Construction Co., 19 T.C. 163, 170 (1952).

Plaintiff had ample opportunity to submit any additional specific facts which it may have gathered by utilization of discovery techniques. However, plaintiff's only effort in this regard during the summary judgment proceedings was the submission of one affidavit in opposition to Motion #2. The affidavit, by Robert M. Lloyd, an employee of the plaintiff, refers to the delay in development of beneficiating facilities by stating that "(w)hat was unusual was the imbalance in available beneficiating facilities which had arisen earlier, the effect of which was experienced primarily in 1947 and 1948. This peculiar imbalance and abnormally poor furnace burden quality in 1947 and 1948 would never have occurred had it been possible for the Corporation to maintain and pursue its normal beneficiating program." (Affidavit in opposition to defendant's Motion #2, April 9, 1969, p. 10)

Plaintiff has suggested repeatedly that "shortages of hot metal" or an "imbalance" between the quality of raw materials as mined and the beneficiating facilities available to render said raw materials suitable for steel-making were in and of themselves qualifying causes.

However, the only specific external causative factors put forth for the delay in development of the facilities are contained in paragraph 16 of the Joint Statement for Motion #2.

■ As a matter of law, war-induced shortages of men and materials and delays by suppliers and subcontractors during the period of 1941 to 1948 may not constitute the basis for relief under 442(a), because effects directly attributable to United States government policies during World War II, including postwar competitive pressures engendered by wartime conditions, are not qualifying abnormalities within the meaning of the statute.

■ When a motion for summary judgment is made and supported by admissions on file, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. Rule 56(e), F.R.Civ.P.; Waldron v. British Petroleum Co., 38 F.R.D. 170, 173–174 (S.D.N.Y.1965), aff'd sub nom., Waldron v. Cities Service Co., 361 F.2d 671, 672 (2nd Cir. 1966), aff'd sub nom., First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

After the defendant had supported its motion with the admission contained in paragraph 16, plaintiff then had the burden of coming forward with specific facts to show the existence of a genuine issue for trial. Instead, plaintiff rested on its general allegations antedating the joint 9(g) statement. Plaintiff also suggested that additional causes for its delay in development of beneficiating facilities might be adduced at a trial, and that live witnesses would be necessary to explain the steel-making process. See the court's opinion on Motion #2, 305 F. Supp. 497, discussing The Propriety of Summary Judgment. Plaintiff did not come forward with specific facts to indicate the existence of any external cause or causes for the delay in development of facilities other than the causative factors stated in paragraph 16.

Upon the factual record submitted for the purpose of the motions, the court concluded, as a matter of law, that summary judgment was appropriate.

Plaintiff seems to suggest that it did not comprehend the purpose of summary judgment procedures. The following excerpts from an oral hearing on the motions reveal some of the court's efforts in furtherance of the very mission of such procedure—to pinpoint the issues and assess the proof to see whether there is a genuine need for trial (Dressler v. MV Sandpiper, supra, 331 F.2d at 132):

> "[Plaintiff's counsel]: I think that it is quite clearly conceded, your Honor, on this No. 2 motion that the production of U. S. Steel was diminished by somewhere in the neighborhood of a million tons of finished steel products going out the door.
>
> "THE COURT: How about the cause?
>
> "[Plaintiff's counsel]: The cause of that is—
>
> "THE COURT: Is that in any place conceded by any of these admissions, these numbered admissions?
>
> "[Plaintiff's counsel]: Yes, sir. I would say that the first 110 admissions in general lead to that conclusion. It is quite clear from these that the primary reason for the finished steel production to be down is because there was a shortage of hot metal, in the neighborhood of two million tons, in each of the years 1947 and 1948." (SM, June 3, 1969, pp. 89–90)

> \* \* \* \* \* \*
>
> "THE COURT [after plaintiff's counsel had noted that two million tons of hot metal amounted to approximately ten per cent of what was contended to be normal production during 1947 and 1948]: Is that the only particular indication of what shortage of

materials means, in light of 16 of the joint statement?

"[Plaintiff's counsel]: No. 16—

"THE COURT: You are speaking of the term 'Shortage of materials.'

"[Plaintiff's counsel]: In 16 that refers—

"THE COURT: 'War,' it says.

"[Plaintiff's counsel]: Yes. 16 relates to the entire period 1941 to 1948 and relates not to the shortage of hot metal as such but to the fact that because a war was on, and then because we were in a post-war period where the shortages continued, we were unable to maintain normal development and expansion of beneficiating facilities.

\*　　\*　　\*　　\*　　\*　　\*

"16 relates to the fact that we were unable to keep that process going during the war and post-war periods, so that as we got into differing coal bodies and differing ore bodies we didn't have the beneficiating machinery to deal with those different types.

"THE COURT: Why do you say that you didn't?

"[Plaintiff's counsel]: We say we didn't for the reasons in 16　\*　\*　\*." (SM, June 3, 1969, pp. 93–95)

\*　　\*　　\*　　\*　　\*　　\*

"THE COURT: Of course as far as facts are concerned if a person, a party against whom a motion is made for summary judgment, doesn't submit sufficient facts, it may lead to a result against that party. I am speaking bluntly about it.

"[Plaintiff's counsel]: Yes, your Honor. We recognize that and we have got 120 paragraphs of facts [110 paragraphs in the joint statement plus plaintiff's statement appended to the joint statement] which we believe are clearly sufficient to bring us within [the statute]." (SM, June 3, 1969, p. 132)

The excerpts from the oral hearings contained above and in the court's opin-

ions of July 1, 1969 are not cited as evidence. Rather, the comments by the court, and by both plaintiff and defendant, serve to illustrate that plaintiff was, or should have been, aware of the obligations of both parties during summary judgment proceedings.

Plaintiff's reliance on Padovani v. Bruchhausen, 293 F.2d 546 (2nd Cir. 1961), is misplaced, because that case did not involve the well-established summary judgment procedures under both the Federal Rules of Civil Procedure and the General Rules of the Southern District of New York.

### IV.

■　Plaintiff maintains that there is no distinction between the "war-induced shortages of men and materials" relied upon as an external cause of production difficulties on Motion #2, and the shortage of materials caused by the Japanese invasion of China in 1937, which was proposed as a hypothetical qualifying abnormality in the Treasury Department Bulletin on Section 722, supra, at ¶ 5145.-13. (Plaintiff's memorandum, August 8, 1969, pp. 31–32)

However, the Japanese invasion and the attendant shortage of materials from China were not occurrences affecting business in general within the United States. Nor were the occurrences directly attributable to United States government policies during World War II. If a United States taxpayer could have established that the Japanese invasion of China which caused materials shortages affected only a reasonably-limited number of other taxpayers, it is conceivable that such an invasion could have constituted a basis for relief within the meaning of either the World War II or Korean statute.

Referring to Motion #3, plaintiff suggests that the court did not consider sufficiently the item in paragraph 45 of the joint statement to the effect that "the normal forces of competition alone were inadequate to keep the prices on steel products down." (Plaintiff's mem-

orandum of law, September 22, 1969, pp. 3–4) However, the court weighed all the factors specifically suggested by the plaintiff that were beyond the realm of competitive pressures. As a matter of law, the court concluded in its opinion on Motion #3 that the additional factors submitted were not shown to consist of more than the valid exercise of governmental regulatory authority.

Plaintiff maintains that the Korean Act was intended to be more liberal to taxpayers than its World War II counterpart. (Plaintiff's memorandum, August 8, 1969, p. 33) Insofar as this alleged distinction refers to *quantitative* considerations, it may have some validity. Nevertheless, the relevant words of § 442(a) concerning the establishment of *qualifying* abnormalities are basically unchanged from the words of § 722(b). As Judge Friendly, speaking for the Second Circuit in Oxford Paper Co. v. Commissioner of Internal Revenue, 302 F.2d 674, 679 (2nd Cir. 1962), observed:

" * * * (W)e cannot properly assume that Congress intended the same words to mean something different than before without clearer instructions than anything Congress has given here. * * * "

Upon studying the memoranda of law submitted by the parties, I conclude that plaintiff's motion for reargument should be denied.

Although my original opinions of July 1, 1969 contained the phrase, "Settle judgment on notice," I now direct the parties to prepare and submit a pretrial order which shall, among other things, provide for elimination of the issues decided on these motions and set forth the issues remaining for trial.

. The court's opinions on the motions by the parties in this case constitute interlocutory adjudications. See 6 Moore's Federal Practice § 56.20[3.—1]', at 2750 (2d ed. 1966).

So ordered.